STATE of Missouri, Respondent,

v.

Gwendolyn WILLIAMS, Appellant.

No. 35554.

Missouri Court of Appeals,
St. Louis District, Division Four.

April 22, 1975.

Shaw & Howlett, Terry J. Flanagan, Clayton, for appellant.

John C. Danforth, Atty. Gen., K. Preston, Dean, II, Scott Raisher, Asst. Attys. Gen., Jefferson City, for respondent.

ALDEN A. STOCKARD, Special Judge.

Gwendolyn Williams, charged by indictment, was found guilty by a jury of murder in the second degree and was sentenced to imprisonment for a term of ten years.

Appellant testified and admitted that she shot Benjamin Matthews. In view of this admission and the nature of the points presented on this appeal, there is no occasion to relate in detail the facts. It is sufficient to say that the shooting occurred at Glover's Food Shop in St. Louis County after an argument and a series of name calling.

On April 29, 1972, at about 1:00 o'clock in the morning, Police Officer James Miller went to Glover's Food Shop after he received a call "that there was a shooting" there. When he arrived he saw a man on the floor against the wall and Benjamin Matthews was on the floor. He also saw a man by the name of L. C. McCray standing at the end of the bar. Appellant was seated on a stool at the end of the bar.

Officer Miller took or received a pistol from Mr. McCray. In answer to the question if he said anything to appellant, he replied: "I asked her did she do the shooting; she says 'yes.'" Appellant objected and moved for a mistrial, which were both overruled. Officer Miller then testified that he requested that an ambulance be called and he then told appellant that she was under arrest. Sergeant Dunn arrived and he advised appellant of her "Miranda rights." She was not asked any question other than the one set out above at the scene by Officer Miller.

Appellant's first point is that the trial court erred when it permitted Officer Miller to testify that she admitted that she shot Matthews when that admission was made before she had been given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In the Miranda case it was ruled that an accused must be advised of certain federal constitutional rights before being subjected to "custodial interrogation," which was defined as "questioning initiated by law en-

forcement officers after a person has been taken into custody or otherwise deprived of action in any significant way." The court further stated:

Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.

No hard and fast rule can be established as to when custodial interrogation begins, but it must be determined from the surrounding circumstances, some of which include probable cause to arrest, the subjective intent of the police officer, and who if anyone was the focus of the investigation at the time of the interrogation. Brown v. Beto, 468 F.2d 1284 (5th Cir. 1972). Officer Miller had no knowledge of what had occurred, except a report that there had been a shooting. He did not go to Glover's Food Shop with the preconceived intent to arrest appellant. He went there to make an on-the-scene investigation of a report that there had been a shooting. Under these circumstances, the single question asked by him of appellant did not constitute "custodial interrogation." There was no custody taken of appellant or restraint of her until she was arrested, which was after she had made the voluntary answer to the question of Officer Miller.

Appellant cites only the Miranda case in support of her contention. She cites no case in which a similar factual situation has been ruled to constitute "custodial interrogation." Numerous cases with analogous factual situations have been ruled contrary to appellant's contention.

In State v. Hale, 463 S.W.2d 869 (Mo. 1971), police officers investigated a report that an automobile was being stripped, and when they questioned the accused at the scene he stated that he was pulling the automobile from a ditch for a friend. When he could not name the friend or the owner of the automobile he was placed under arrest. The court ruled that the accused's statements to the police were the result of proper pre-custodial interrogation. Also, in State v. Bradford, 434 S.W.2d 497 (Mo.1968), police officers saw an automobile with two men in it at a closed shopping center, and decided to check on the reason it was there. In the course of the questioning the accused made some statements which were later used against him. It was held that this was not custodial interrogation but proper precustody investigation, noncoercive in nature, and justified by the circumstances as a legitimate police practice. For other cases supporting the view we have taken, see Allen v. United States, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968); State v. Ralls, 472 S.W.2d 642 (Mo.App.1971); Schnepp v. State, 84 Nev. 120, 437 P.2d 84 (1968); Stallings v. State, 255 Ind. 365, 264 N.E.2d 618 (1970); Ison v. State, 281 Ala. 189, 200 So. 511 (1967); and see the cases cited in the annotation entitled "What Amounts to Custodial Interrogation," 31 A.L.R.3d 565.

In addition to the fact that there is no merit to appellant's contention on the basis presented, appellant took the witness stand and on direct examination testified that she intentionally shot Matthews. In State v. Ussery, 357 Mo. 414, 208 S.W.2d 245 (1948), it was stated: "[W]hen the truth of a confession is established by the very person who made it under such solemn circumstances as on oath in open

court, he may not be permitted to claim error because of the use of the confession on the ground it was involuntary." See also State v. Crow, 486 S.W.2d 248 (Mo.1972), where the rule was applied to a situation where it was contended that the requirements of Miranda v. Arizona had been violated, but the accused testified under oath to the substance of the confession, and the court said: "Any error in its [the confession] admission in evidence was harmless," citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Other cases where the rule has been applied include State v. Taylor, 472 S.W.2d 395 (Mo.1971); State v. Brandt, 467 S.W.2d 948 (Mo.1971); State v. Walker, 416 S. W.2d 134 (Mo.1967); and State v. McGee, 447 S.W.2d 270 (Mo. banc 1969). There is no merit to appellant's first point.

Appellant next claims prejudicial error resulted when the trial court sustained the objection of the prosecutor to an attempt of appellant to impeach the testimony of John Arrington, a witness for the State. A statement of certain testimony is necessary.

As is typical in cases of this nature the testimony is none too clear, but we shall attempt to set out the essential parts of the testimony of John Arrington. He stated that when he went to Glover's Food Shop a girl there was talking to appellant on the telephone, and that he took the telephone and talked to her. Appellant told Arrington that Matthews had told her that he, Arrington, was going to beat her up. Arrington denied this, and she told him over the telephone that she was coming out there and that she was going to bring a pistol. When she arrived she was accompanied by her son and four other persons. One of them, a person named Ricky, told Arrington to "leave Gwen alone," and then the other four left. Later Matthews drove up and "blew his horn" and Arrington went outside and asked him if he had a pistol. Appellant objected to Arrington

stating what Matthews said and the objection was sustained, but he did testify that he, Arrington, did not get a pistol. The two then went to the bar, and appellant walked up to them. Matthews "pushed her back" and said, "Get out of my face." Arrington and Matthews then walked toward the door, and without anything further being said, Arrington hit Ricky, the person who had arrived with appellant but did not leave with the other four. The reason for this assault is not disclosed, but Matthews also for some reason hit Ricky. The next thing that happened was that Matthews said, "This bitch got a pistol," and appellant then shot him. Arrington ran to the door and appellant shot him in the back. McCray then took the pistol away from her. Arrington testified that he did not have any weapon on him, and that he did not observe any weapon on Matthews. On cross-examination, Arrington stated that after Matthews pushed appellant back and told her to "get out of his face," he said, "I'm going to get my pistol out of the car." He and Matthews both walked toward the door, and then Arrington "turned around and hit this dude named Ricky," apparently because he had previously told Arrington to "leave Gwen alone," and had come "up to my face." Arrington twice stated that although Matthews said he was going to get his pistol, he "didn't have any pistol," but on both occasions appellant objected and the statements that Matthews had no pistol were stricken. Toward the end of his testimony, on recross-examination, he was asked if Matthews said: "I'm going outside to get my pistol," and he replied, "Yes, I remember telling you, but before he told me he didn't have no pistol." Appellant's counsel then said: "That is not what I am asking you."

Subsequently, Beverly McCray was called as a witness for appellant. After testifying that she knew John Arrington she was asked: "Now, did you hear him say anything about a gun in an automobile that night?" Her reply was that she did,

and when she was asked what he said the prosecutor objected to her answering because it would call for hearsay. Appellant's counsel then said: "This is impeachment of John Arrington, who said there was no gun in his car, that Benny [Matthews] didn't have a gun, that he didn't know of either one of those two having a gun." Appellant then made an offer of proof that if permitted she would testify that "John Arrington told her there was a pistol under the front seat," presumably of Matthew's automobile.

In her brief appellant argues that "This evidence would have impeached the testimony given by John Arrington in which he testified that he did not have a gun nor see a gun on the night in question."

■ We have set out at considerable length the testimony, and our first reaction is that whether or not Arrington told Beverly McCray that "There was a pistol in the car under the front seat" was immaterial to any issue in the case. Appellant does not contend that she shot Matthews in self-defense on the theory that she considered it necessary to do so to prevent him from getting to the gun, if any, under the front seat of his automobile. Appellant testified that Arrington and Matthews "jumped on" Ricky and "they was both beating him up." She got up and asked them to leave him alone, and he, Matthews, was calling her names, and he acted "like he might have a gun." Matthews "kept coming closer to me, cursing and carrying on," and a person by the name of Junebug then gave her a gun. She then testified that she "kept asking [Arrington] and [Matthews] to leave him alone, and all I know is I fired," and at the time Matthews "was coming up on me." There is no contention that appellant heard what Arrington supposedly told Beverly McCray. A defendant in a criminal prosecution may show inconsistent statements by a prosecuting witness, but it is not error to exclude offers of impeachment as to immaterial or colla-

teral matters. State v. Taylor, 486 S.W.2d 239 (Mo.1972); State v. Alexander, 499 S.W.2d 439 (Mo.1973).

■ Also, it is the well established rule that in order to impeach a witness on the basis of a prior inconsistent statement it is necessary to first lay the proper foundation by asking the witness whether he made the specific statement upon which he is sought to be discredited. State v. Haynes, 482 S.W.2d 444, 447 (Mo.1972); State v. Dent, 473 S.W.2d 370 (Mo.1971); State v. Hughes, 460 S.W.2d 600 (Mo. 1970). This appellant did not do, and the trial court did not err in sustaining the objection to the proposed impeaching testimony.

■ The remaining five points purport to challenge instructions. In each of the five points appellant has not complied with Rule 84.04(e), V.A.M.R., which requires that "If a point relates to the giving, refusal or modification of an instruction such instruction shall be set forth in full in the argument portion of the brief." This failure to comply with the rules would justify a summary disposition of these points. However, in a liberal exercise of discretion, we shall review appellant's contentions insofar as they otherwise comply with the rules.

Appellant first challenges Instruction No. 2, the verdict directing instruction on murder in the second degree, for the reasons, quoting from appellant's point, that it (a) "does not properly state the law of murder in the second degree;" it is (b) "confusing and improper and does not properly define the elements of murder in the second degree;" (c) it "limits the defense of defendant to that of self-defense by including the sentence 'and if you further find and believe from the evidence beyond a reasonable doubt that said shooting, wounding and killing, if you so find, were not committed under self-defense under circumstances constituting self-defense as de-

fined and explained in subsequent instructions you will find the defendant guilty of murder in the second degree.'" and (d) by so incorporating in the verdict directing instruction the defense of self-defense it placed a burden upon the defendant to prove the defense of self-defense.

◼ The assertions that the instruction "does not properly state the law . . . does not properly define the elements . . . [and] is confusing and improper" are so lacking in particularity and detail that nothing has been preserved for appellate review. State v. Bea, 509 S. W.2d 474 (Mo.App.1974); State v. Richardson, 321 S.W.2d 423 (Mo.1959). Also there is no attempt to demonstrate or point out how this instruction "limits the defense" and shifts the burden of proof. State v. Richardson, supra. If appellant alludes to the fact that the instruction does not contain a reference to accidental homicide, although this is speculation on our part because she does not say so, the evidence does not warrant such a reference. See State v. Agee, Mo., 474 S.W.2d 817. Furthermore, the defense of self-defense and accidental homicide are inconsistent, and both may be given only under circumstances not applicable to this case. State v. Brown, 502 S.W.2d 295 (Mo.1973).

◼ The instruction in this case defined murder in the second degree as the killing of a human being wilfully, feloniously, premeditately and with malice aforethought. It then defined the above terms in language frequently approved. The instruction then hypothesized the facts as supported by the evidence in the conventional form prior to the mandatory use of MAI–CR. We find no prejudicial error in the giving of Instruction No. 2.

◼ Appellant next challenges Instruction No. 3, which submitted the offense of manslaughter because it "does not set forth any of the elements of man-

slaughter so that a jury could distinguish between the offense of manslaughter and murder in the second degree." These broad conclusionary statements do not preserve anything for review, but more important, the language of the instruction is in the precise form of MAI–CR 6.08 submitting the offense of manslaughter; and the challenge, such as it is, is totally without merit. See State v. Yeokum, 516 S.W.2d 535 (Mo.App.1974).

◼ Appellant also challenges Instruction No. 5. In substance it told the jury that the law of self-defense does not imply the right to attack, nor will it permit acts done in retaliation or for revenge. It then hypothesized that if the jury found beyond a reasonable doubt that defendant sought, brought on or voluntarily entered into the difficulty with the deceased for the purpose of wreaking vengeance upon him, or with no reasonable apprehension of immediate and impending danger to herself, but for the purpose of retaliation and revenge for the purpose of punishment, then she cannot avail herself of the law of self-defense. This instruction must be read with Instruction No. 4, submitting self-defense and which is not challenged. Appellant asserts that instruction No. 5 is prejudicial because "it gave the prosecution an additional verdict directing instruction, which, in effect, destroys the defense of self-defense," and it injects "the implication of attack by the defendant and retaliation for revenge by the defendant, none of which was evidenced in the case." We do not agree that this instruction is not supported by the evidence. From the circumstance of name calling, and the altercation with the boy named Ricky, a jury reasonably could infer that appellant attacked the deceased in a "spirit of retaliation and revenge for the purpose of punishing deceased." An instruction in substantially similar language and in substantially similar circumstances was expressly approved in State v. Aubuchon, 394 S.W.2d 327 (Mo.1965) and also in State v. Lassieur,

242 S.W. 900 (Mo.1922). We find no prejudicial error.

Appellant's challenge to Instruction No. 6 is that it instructed the jury that "language or epithets, however offensive, will not justify or excuse an assault," and that this was prejudicial error because at no time did the appellant maintain that she shot Matthews for that reason, and it injected into the case of self-defense matters not in evidence.

There is no merit to the contention that the instruction was not supported by the evidence. The record shows that on several occasions Matthews called appellant a "whore" and a "bitch" immediately before the shooting, and appellant testified that Matthews approached her "cursing and carrying on." Such an instruction was approved in State v. O'Leary, 44 S.W.2d 50 (Mo.1931). Also, what appellant maintained was the reason for the shooting is not controlling on the propriety of such an instruction; the question is whether it was supported by the evidence. This instruction was not prejudicially erroneous.

Appellant's final point is that Instruction No. 7 was prejudicially erroneous because it contained the phrase, "A doubt to authorize an acquittal on that ground [reasonable doubt] ought to be a substantial doubt touching on defendant's guilt." This same instruction has been approved in State v. Scott, 491 S.W.2d 514 (Mo. banc 1973); State v. Taylor, 506 S.W.2d 94 (Mo.App.1974); State v. Coleman, 460 S.W.2d 719 (Mo. banc 1970); State v. Edwards, 435 S.W.2d 1 (Mo.1968); and State v. Mooring, 445 S.W.2d 303 (Mo.1969). It deserves no further discussion in this case.

The judgment is affirmed.

SMITH, C. J., and NORWIN D. HOUSER, Special Judge, concur.