**STATE of Missouri, Respondent,**

v.

**James A. LOVE, Appellant.**

**No. KCD 28331.**

Missouri Court of Appeals, Kansas City District.

. Dec. 27, 1976.

Rehearing Denied Jan. 31, 1977.

Robert N. Adams, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Defendant James A. Love was charged by two separate informations with second degree murder. The victims, respectively, were Jeffery Berger, a male child, and Sheilia L. Curtright, the child's babysitter. Both charges, by stipulation of the parties, were consolidated for trial. A Jackson County jury found defendant guilty as charged in both informations and fixed his punishment at one hundred and fifty years imprisonment for each conviction. Judgments were entered and sentences were pronounced accordingly, said sentences to run consecutively.

On appeal, defendant exhorts this court to grant him a new trial because of the following incidents of alleged error (substantially condensed) committed by the trial court: (1) denial of defendant's motion to suppress certain evidence, namely, photographs taken of him following his arrest and seizure of the boots he was wearing at the time of his arrest;[1] (2) admitting into evidence and permitting the state to project before the jury a series of colored slides of the victims over defendant's objection that they were inflammatory and prejudicial; (3) sustaining the state's objection to evidence sought to be introduced by defendant that his stepsister, who was originally scheduled to babysit with the male child on the fatal night in question, was thereafter assaulted by an individual resembling defendant and received threatening notes signed the "Butcher"; and (4) permitting one of the state's witnesses, over defendant's objection, to give an opinion as to how a cut on one of defendant's fingers occurred. Defendant also challenges the sufficiency of the evidence to support the guilty verdicts returned by the jury.

The trial court's denial of defendant's motion to suppress will be addressed first as several of the points relied upon by defendant on appeal directly or indirectly involve the items of demonstrative evidence which were sought to be suppressed. At the outset, a general resume of the facts, as gleaned from a voluminous transcript, will be set forth for the purpose of giving a broad overview of the homicides for which defendant stood trial. Later on, interspersed throughout treatment of the various points raised by defendant, additional facts deemed germane to their resolution will be set forth.

On the evening of December 31, 1974, Mr. and Mrs. Richard Berger, parents of Jeffery Berger, a male child two and one-half years old, engaged Sheilia Curtright, the fourteen year old daughter of Mr. and Mrs. Roy Curtright, as a babysitter. The Berger residence was the west unit of a duplex in Lee's Summit, Jackson County, Missouri, and bore the address of 610A Columbus Street. The east unit of the duplex, bearing the address of 610B Columbus Street, was occupied by the defendant and his parents. After Sheilia Curtright arrived at the Berger residence to babysit with Jeffery, Mr. and Mrs. Berger left for the evening. At approximately 11 P.M. on the evening of December 31, 1974, a friend of Sheilia Curtright's telephoned her at the Berger residence. Sheilia Curtright terminated the telephone conversation shortly after it started because someone was at the front door of the Berger residence. Sometime after 11 P.M. Sheilia's friend tried to call again but no one answered. The friend tried to call Sheilia a number of times during the course of the next thirty minutes but still got no answer. Shortly after 11 P.M. the telephone at the home of Mr. and Mrs. Roy Curtright, Sheilia's parents, rang several times and when Mrs. Curtright answered the phone there was no response at the other end. Mrs. Curtright then attempted to call Sheilia at the Berger residence, and, although the phone rang numerous times, there was no answer. The Curtrights became concerned and decided to drive over to the Berger residence. They arrived at the Berger residence at approximately 11:45 P.M. and upon their arrival observed smoke coming from the vents around the eaves of the duplex. All the doors and windows of the Berger residence were locked. Consequently, Mr. Curtright broke open the front door and made his way into the Berger residence. Finding no one in the living room, he went into the kitchen area. There he observed the body of Jeffery Berger lying in a pool of blood on the kitchen floor. Jeffery's throat was cut and there were multiple wounds about his head and face. He also observed his daughter lying in a pool of blood on the kitchen floor

1. Defendant was initially arrested without a warrant. Warrants for defendant's arrest were subsequently issued and executed. Defendant has never charged, either below or on appeal, that the amount of time which expired between his warrantless arrest and issuance and execution of the arrest warrants in and of itself invalidated his conviction. See *State v. McKinney,* 498 S.W.2d 768, 770–71 (Mo.1973).

to the right of Jeffery Berger. Sheilia's throat was also cut and, in addition, she had multiple wounds about the head and face, multiple "puncture" wounds in her right side, and bruises on her right thigh. There was no evidence that either victim had been sexually molested. Jeffery showed no signs of life. Sheilia still showed some faint signs of life. Shortly thereafter both victims were pronounced dead. The Lee's Summit police and fire departments were summoned to the scene. The Lee's Summit Police Department, in conjunction with several other area law enforcement agencies, conducted an extensive investigation of the homicides.

Attention is now directed to the first point raised by defendant. It is framed in the following language: "The trial court erred in denying defendant's pretrial motion to suppress evidence in that defendant was illegally arrested without warrant and probable cause, was not given the constitutional warnings and was denied assistance of counsel, all in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States and Article I, Sections 15 and 19 of the Missouri Constitution and Missouri Supreme Court Rule 21.14 and that the burden of persuasion as to probable cause was improperly placed on defendant, all to his detriment and prejudice denying him a fair and impartial trial." Frankly, it is cast in such abstruse terms as to literally defy comprehension; moreover, it fails to comply with Rule 84.04(d). However, in view of the gravity of the offenses of which defendant stands convicted, and the length of the sentences imposed, this court will undertake the exceedingly difficult and concededly questionable task of attempting to give some semblance of meaning to defendant's first point. To do so, recourse must be made to his motion to suppress, his point on appeal and the argument tendered in its support. Even this approach is fraught with almost insurmountable difficulty. For example, defendant appears to assert in his first point that photographing him and taking his boots violated Criminal Rule 21.14. This court is quick to admit that it is virtu-

ally at a total loss to garner any relevancy or meaning whatsoever from this particular facet of defendant's first point. In any event, defendant's argument with respect thereto is non sequitur. One other facet of defendant's first point may be expeditiously disposed of at this juncture—defendant's contention that "the burden of persuasion as to probable cause was improperly placed on defendant". The argument portion of defendant's brief discloses that "probable cause", in the context in which it is used, refers to "probable cause" for defendant's arrest without a warrant. A review of the record fails to support defendant's claim that the trial court placed upon him the "burden of persuasion" as to "probable cause" for his warrantless arrest.

Although disclaiming clairvoyant power, this court will now endeavor to set forth what it believes to be the grounds of defendant's claim that the trial court erred in overruling his motion to suppress. As construed by this court, defendant appears to contend that the trial court erred in overruling his motion to suppress certain items of demonstrative evidence in question because: (1) all information obtained from defendant by the arresting officer prior to defendant's arrest must be excluded from consideration as probable cause to support the ensuing warrantless arrest of defendant because the arresting officer failed to give defendant a "Miranda" warning before obtaining such information, thereby violating defendant's constitutional privilege against self incrimination as guaranteed by the Fifth Amendment to the Constitution of the United States and Art. I, § 19, of the Constitution of Missouri and defendant's right to the assistance of counsel as guaranteed by the Sixth Amendment to the Constitution of the United States; (2) with or without the information referred to in (1), supra, the arresting officer lacked probable cause to arrest defendant, therefore seizure of the boots defendant was wearing at the time he arrived at police headquarters was not incident to a lawful arrest and constituted an illegal search and seizure proscribed by the Fourth Amendment to the

Constitution of the United States and Art. I, § 15 of the Constitution of Missouri; and (3) photographs taken of defendant at police headquarters without the presence of counsel violated defendant's right to the assistance of counsel as guaranteed by the Sixth Amendment to the Constitution of the United States.

Resolution of defendant's first point (as construed by this court) necessarily requires a detailed analysis of the evidence presented at the hearing on defendant's motion to suppress.

The record discloses that William R. Parsons, a member of the Lee's Summit Police Department, arrived at the scene of the homicides at approximately 12:26 A.M. on January 1, 1975. He participated in the investigation being conducted at the scene for approximately one hour and fifteen minutes. At approximately 1:45 A.M. Sgt. Lapour of the Jackson County Sheriff's Department suggested to Officer Parsons that he go to 516 North Corder, Lee's Summit, Missouri, because of "the possibility of someone at that residence who might possibly have knowledge of an incident that occurred at 610 Columbus, Lee's Summit". 516 North Corder in Lee's Summit, Missouri, was the address of a residence occupied by Daniel A. Stockton, a "private security officer". The defendant was at the Stockton residence when Officer Parsons arrived. Defendant had gone to the Stockton residence to use the telephone. Defendant's presence at the Stockton residence is otherwise unexplained. When Officer Parsons arrived at the Stockton residence, Sgt. Lapour and several other unidentified police officers, two of whom were in uniform, were present. The two uniformed police officers were carrying visible, but holstered, sidearms. Parsons and the other officers were not carrying any visible weapons or sidearms. None of the officers, including Parsons, ever drew or flourished a weapon of any kind. It is implicit that Officer Parsons and the other police officers had Stockton's consent to enter his residence at 516 North Corder. Upon entering the Stockton residence Officer Parsons ob-

served defendant talking on the telephone. The defendant was wearing a short-sleeved shirt and Parsons observed that there were visible scratches on defendant's right arm just above the elbow and what appeared to be a cut or wound of some type on the outside of defendant's left little finger. Officer Parsons also observed that defendant appeared to be "rather nervous". Officer Parsons then asked defendant if he would hang the phone up since he wanted to talk to him. Defendant complied with Parsons' request. No force or coercion was exerted by Officer Parsons to get defendant to do so. A short conversation then ensued between Officer Parsons and the defendant. No "Miranda" warning was given to defendant prior to or during the course of this conversation. Defendant told Officer Parsons that he had been at a dance at the "Community Building" in Lee's Summit, Missouri, the evening of December 31, 1974, and left the dance around 11:15 P.M. and went to his home at 610B Columbus Street for the purpose of placing some money which had been collected at the dance, and for which he was responsible, in an attache case. Defendant stated that he returned to the dance before midnight. Officer Parsons asked defendant if the clothing he was then wearing was the same as that which he wore when he originally left home to go to the dance. Defendant replied that it was not, and said that he changed his clothes after he arrived at his home from the dance to put the money in the attache case. Officer Parsons also asked defendant if the boots he was then wearing were those worn by him when he originally left his home for the dance, and whether or not he changed his footwear when he changed his clothing. Defendant replied that the boots he had on were those he was wearing when he originally left his home for the dance and that he had not changed his footwear when he changed his clothing. Defendant also identified himself to Officer Parsons. Defendant told Officer Parsons that the cut on his left little finger was caused when he slammed a car door on it. Defendant voluntarily showed Officer Parsons a cut on the palm side of his right little finger and

explained that it was cut when he fell in a gravel street while attending the dance earlier in the evening. Officer Parsons testified that he did not consider defendant "a suspect" while he was talking with him. Officer Parsons was the only officer conversing with or questioning defendant at the time. Several times during the course of the conversation defendant "indicated" that he would "like" to talk to an attorney. However, the record is barren of any evidence that defendant ever attempted to contact or talk with an attorney at the time, or that Officer Parsons or any other officer ever restrained or prevented defendant from doing so. Moreover, there is not a scintilla of evidence that Officer Parsons or any other officer inhibited or thwarted defendant's freedom of action in any manner prior to or during the conversation. There is not one iota of evidence which suggests or intimates that the statements made by defendant during the conversation were involuntary or coerced. After concluding the conversation with defendant, Officer Parsons telephoned Lt. Moore who was at the scene of the homicides and related what he had visibly observed and orally learned from defendant during the conversation. Lt. Moore was in overall charge of the investigation being conducted in connection with the homicides. Lt. Moore was previously acquainted with the defendant. Prior to receiving Officer Parsons' call, Lt. Moore had been advised by another officer, who was participating in the investigation at the scene of the homicides, that a Mr. Ahner had been standing on the front porch of a house across the street from the duplex at 610 Columbus Street, around 11:00 P.M. at which time he had observed an unidentified individual, whom he described in terms that fit defendant's general description, go up to the front door of the Berger residence at 610A Columbus Street. Lt. Moore instructed Officer Parsons to place defendant under arrest. Officer Parsons then placed defendant under arrest for the murders, gave him a "Miranda" warning, and took him to the Lee's Summit Police Headquarters. Shortly after arriving at the Lee's Summit Police Headquarters defendant was told to disrobe and the boots and clothing he was wearing were confiscated by the police. Shortly thereafter, at police headquarters, photographs were taken of defendant, the scratch marks on his right arm, and the cuts or wounds on his fingers.

Subsequent laboratory tests revealed that "bloodstains" found on defendant's right boot matched "the autopsy blood of Miss Sheilia Curtright with respect to the group and the enzymes". Laboratory tests of defendant's left boot revealed an abrasion approximately the same width as a dark scuffmark found on the kitchen wall of the Berger residence and that a lower rivet on the backstrap of defendant's left boot matched a small "striated mark" also found on the kitchen wall of the Berger residence.

Defendant cites and relies upon *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), for the proposition that information obtained by constitutionally impermissible means cannot be utilized as probable cause to justify a warrantless arrest. Whether or not *Wong Sun* is susceptible of the broad interpretation which defendant ascribes to it is academic if the information obtained from defendant by Officer Parsons did not stem from a "custodial interrogation". In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States defined what was meant by a "custodial interrogation" which triggers the necessity of giving a "Miranda" warning before subjecting a person to interrogation: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The majority opinion in *Miranda* dropped the following footnote to this definition: "This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused."

Whether the pre-arrest information obtained by Officer Parsons resulted from a "custodial interrogation" in the sense defined in *Miranda*, thereby foreclosing (as contended by defendant) its consideration

by Officer Parsons as probable cause for arresting defendant because no "Miranda" warning was given, necessarily turns on the particular facts disclosed by the record. The difficulty encountered in drawing a dividing line between a "custodial interrogation" which is subject to all of the ramifications of *Miranda*, and a non-custodial interrogation which is not subject to the ramifications of *Miranda*, is vividly demonstrated by a galaxy of cases collected in an annotation in 31 A.L.R.3d 565 (1970). The text of the annotation, pp. 577–578, enumerates five general factors gleaned from the collected cases as being significant for determining the existence or non-existence of a "custodial interrogation" within the purview of *Miranda*. The five significant factors referred to are: (1) was the interrogator inherently intimidating; (2) was the interrogee, due to age, intellect, and physical condition, susceptible to intimidation; (3) was the place of interrogation inherently coercive; (4) was the interrogation accusatory in nature as opposed to being investigatory in nature; and (5) had the investigation "focused" on the interrogee as a suspect when the interrogation occurred.

One of the latest expressions at the appellate level in this state on the subject is found in *State v. Williams*, 522 S.W.2d 641, 644 (Mo.App.1975):[1] "No hard and fast rule can be established as to when custodial interrogation begins, but it must be determined from the surrounding circumstances, some of which include probable cause to arrest, the subjective intent of the police officer, and who if anyone was the focus of the investigation at the time of the interrogation." *Williams*, although cast in different language, appears to enumerate some, but not all, of the significant factors mentioned in the annotation in 31 A.L.R.3d, supra.

In the recently decided case of *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the Supreme Court of the United States clarified what was meant by the "focus" of an investigation for *Miranda* purposes by stating that it meant questioning or interrogation undertaken by law enforcement officers after a person had been taken into custody or otherwise deprived of his freedom of action in some significant way. The annotation in 31 A.L.R.3d, supra, and *State v. Williams*, supra, both predate *Beckwith v. United States*, supra.

■ However helpful certain significant factors, supra, may be in drawing a proper dividing line between "custodial interrogation" and non-custodial interrogation, the crucible remains the same—was the questioning initiated after the interrogee was "taken into custody or otherwise deprived of his freedom of action in any significant way". *Miranda v. Arizona*, supra, 384 U.S. at 444, 86 S.Ct. at 1612. In the instant case the defendant had not been taken into custody "or deprived of his freedom of action in any significant way" at the time he was questioned by Officer Parsons. A pragmatic analysis of the relevant evidence in light of the "significant factors" heretofore iterated permits no other conclusion. The conduct of Officer Parsons while questioning the defendant was not inherently intimidating. No drawn weapons were exhibited, no ploys were engaged, and the questioning was brief and conducted solely by Officer Parsons. It cannot be said that defendant was susceptible to intimidation in view of the fact he was an adult, of average intelligence or above, and in good physical condition. The locale where the questioning occurred, the Stockton residence, as opposed to police headquarters or a place suggesting a similar detentive atmosphere, was not inherently coercive. The questioning was not accusatory in nature. To the contrary, at the time it was conducted it was purely investigatory in nature. When Officer Parsons questioned defendant, the finger of suspicion had not pointed to defendant, or any one else, as the perpetrator of the homicides under investigation. Officer Parsons was merely checking an investigative lead relayed by another officer that someone at the Stockton residence "might

1. Cited in *State v. Starkey*, 536 S.W.2d 858, 863 (Mo.App.1976).

possibly have knowledge" of the homicides committed at 610A Columbus Street. Officer Parsons testified that he did not consider defendant "a suspect" when he questioned him. The widespread general investigation underway at the time, of which Officer Parsons' questioning of defendant was only a small part, was in an investigatory rather than an accusatory stage. Moreover, whether or not the investigation had focused (in the ordinary and literal sense or meaning of the term) on defendant at the time he was questioned, standing alone, has been virtually eliminated, or in any event greatly minimized, as a "significant factor" by *Beckwith v. United States,* supra. The contention that Officer Parsons was required to give defendant a "Miranda" warning aside, defendant does not suggest or contend that Officer Parsons exerted any physical or psychological coercion to elicit the information which was obtained from him, or that it was otherwise involuntarily or unfreely given. Nor does defendant contend that he sought to terminate the questioning by remaining silent or by leaving, or that he lacked or believed that he lacked freedom of action to do either. The record is bereft of any evidence that defendant was taken into "custody" or "deprived of his freedom of action in any significant way" when he was interrogated by Officer Parsons at the Stockton residence. Consequently, the information obtained by Officer Parsons from defendant at the Stockton residence did not stem from a "custodial interrogation" within the meaning of *Miranda v. Arizona,* supra. Concomitantly, the information so obtained by Officer Parsons from defendant was not constitutionally proscribed by the Fifth and Sixth Amendments to the Constitution of the United States because of Officer Parsons' failure to give a "Miranda" warning to defendant prior to engaging him in conversation. Therefore, the information obtained by Officer Parsons from defendant at the Stockton residence may properly be considered in assessing the existence of probable cause for defendant's arrest without a warrant.

The second component of defendant's first point (as construed by this court) is now reached. Defendant appears to contend that Officer Parsons lacked probable cause to arrest him without a warrant and therefore Officer Parsons' seizure of the boots defendant was wearing after his arrival at police headquarters was not incident to a lawful arrest and constituted an illegal search and seizure proscribed by the Fourth Amendment to the United States Constitution and Art. I, § 15, of the Constitution of Missouri. The second component of defendant's first point necessarily rises or falls on whether probable cause existed at the time of defendant's arrest to believe that he committed the homicides in question.

■■ Probable cause to legally justify a warrantless arrest is virtually incapable of being defined in precise or exact terms. When faced with the necessity of resolving the existence or non-existence of probable cause to support a warrantless arrest, courts look at the particular facts at hand to see if sufficient information of a reliable or trustworthy nature existed to cause a "prudent" or "reasonable" man to believe that the arrestee committed the offense for which he was arrested. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); and *State v. Dodson,* 491 S.W.2d 334, 336 (Mo. banc 1973). Facts or information constituting probable cause may be communicated to an arresting officer by another officer. *State v. Witt,* 371 S.W.2d 215, 218 (Mo.1963). As stated in *United States v. Stratton,* 453 F.2d 36, 37 (8th Cir. 1972), and quoted with approval in *State v. Pruitt,* 479 S.W.2d 785, 788 (Mo. banc 1972), " ' . . . the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause . . . [and] . . . [t]he arresting officer himself need not possess all of the available information.' " Thus, it is proper to consider the collective knowledge of Lt. Moore and Officer Parsons to determine whether probable

cause existed to arrest defendant without a warrant.

Guided by the attendant principles heretofore mentioned, it is now appropriate to look at the collective knowledge possessed by Lt. Moore and Officer Parsons, including the information visually observed and orally obtained by Officer Parsons from defendant at the Stockton residence, to determine whether probable cause existed to sanction defendant's warrantless arrest. This court concludes that the following information collectively possessed by the officers disclosed a nexus between defendant and the homicides for which he was arrested. The scratches observed on defendant's right arm and the cuts or wounds on his fingers bespoke a struggle and a recent encounter with some type of a sharp cutting instrument. After 11:00 P.M. defendant was present in the unit of the duplex he and his parents occupied, which was immediately adjacent to the unit of the duplex where the homicides occurred. While there, defendant changed clothes before returning to the dance which he had attended. The scene of the crime evidenced great violence and a spilling of copious amounts of human blood. At approximately 11:00 P.M. a person matching defendant's general description was observed at the door of the unit of the duplex where the homicides occurred. Defendant appeared "nervous" while he was being questioned at the Stockton residence. Probable cause to justify defendant's warrantless arrest for the homicides existed, and, perforce, he was legally arrested.

Having found that defendant was legally arrested, seizure of his boots by Officer Parsons at police headquarters was incident to his lawful arrest and did not constitute a constitutionally impermissible search and seizure. The Fourth Amendment's absolute admonition against unreasonable searches is not violated by a search incident to a lawful arrest. *Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); and *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The fact that defendant's boots were not seized until he arrived at police headquarters did not vitiate the search and seizure as being incident to his lawful arrest. *Cotton v. United States*, 371 F.2d 385, 392 (9th Cir. 1967); *State v. Thompson*, 425 S.W.2d 80 (Mo.1968); *State v. Wragg*, 395 S.W.2d 196 (Mo.1965); and *State v. Masters*, 530 S.W.2d 28 (Mo.App. 1975).

Attention now turns to the final component of defendant's first point (as construed by this court). Defendant appears to question the pictures taken of him at police headquarters after he was arrested because he didn't have counsel present at the time. There is no merit, constitutional (Sixth Amendment) or otherwise, to this aspect of defendant's first point. *State v. Stevens*, 467 S.W.2d 10, 15–16 (Mo.1971) holds that extracting blood samples from an accused is not a "critical" stage of the criminal proceedings entitling the accused to the assistance of counsel. *Fields v. State*, 466 S.W.2d 679, 681 (Mo.1971), citing *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), similarly hold that subjecting an accused to a parafin-nitrate test is not a "critical" stage of the criminal proceedings entitling the accused to the assistance of counsel. Taking photographs of an accused is far more innocuous and further removed from a "critical" stage of the criminal proceedings than drawing blood samples from an accused or subjecting an accused to a parafin-nitrate test. The taking of the photographs complained of by defendant without the presence of counsel did not violate defendant's right to the assistance of counsel as guaranteed by the Sixth Amendment to the Constitution of the United States.

Defendant's second point charges the trial court with error for having admitted certain postmortem pictures of the victims. Seven were pictures taken from different angles showing various wounds received by victim Curtright and five were pictures taken from different angles show-

ing various wounds received by victim Berger. In many respects defendant's second point is as myopic as his first point. To support it, he appears to rely upon a multiplicity of grounds, the majority of which were not included in the objections he lodged against the admission and display of the pictures during the course of the trial. It is well settled that an assignment of error as to the admissibility of evidence is not preserved for appellate review unless presented to the trial court, during trial, when the complained of evidence is objected to. *State v. Davis*, 482 S.W.2d 486, 489 (Mo.1972); *State v. Brown*, 360 S.W.2d 618, 621 (Mo.1962); *State v. Hernandez*, 325 S.W.2d 494, 496 (Mo.1959); and *State v. Washington*, 320 S.W.2d 565, 568 (Mo.1959). As tersely stated in *State v. Witherspoon*, 231 Mo. 706, 133 S.W. 323, 327 (1910), " . . . it is also settled that appellant will not be permitted to broaden the scope of his objection on appeal beyond that made in the trial court." During trial, the only grounds defendant included in his objection to the postmortem pictures of the victims were the method by which they were displayed to the jury, i. e., the projection of colored slides, and that they were inflammatory and prejudicial. The aforementioned grounds were raised in defendant's motion for new trial and appear to be included in his second point. Defendant's second point will be approached and disposed of on this basis.

■ It is implicit in the recent case of *State v. Damico*, 513 S.W.2d 351, 359 (Mo. 1974), that the use of colored slide reproductions, in lieu of the photographs from which they were reproduced, is not per se objectionable and that their admissibility and projection before the jury is tested by the same principles attendant to photographs generally. See *State v. Brady*, 105 Ariz. 190, 461 P.2d 488, 494 (banc 1969), for a more explicit and definitive statement of the same principle.

■ The fact that pictures are gruesome, repugnant and shock provoking, thereby giving them a prejudicial and inflammatory aura, in and of itself, does not preclude their admission and display to a jury if they are otherwise relevant and have probative value. *State v. Jones*, 515 S.W.2d 504, 506 (Mo.1974); *State v. Parsons*, 513 S.W.2d 430, 439 (Mo.1974); *State v. Clark*, 494 S.W.2d 26, 30 (Mo. banc 1973); *State v. Crow*, 486 S.W.2d 248, 256 (Mo. 1972); *State v. Stevens*, supra, at 24; and *State v. Moore*, 303 S.W.2d 60, 66 (Mo. banc 1957). Pictures of the victims of homicides, even though gruesome, repugnant and shock provoking in nature, have been held admissible because of their probative value in a wide variety of instances. They are deemed to have probative value if they show the nature and location of wounds inflicted upon a deceased. *State v. Jones*, supra, at 506; *State v. Wallace*, 504 S.W.2d 67, 72 (Mo.1973), *cert. denied*, 419 U.S. 847, 95 S.Ct. 84, 42 L.Ed.2d 76 (1975); *State v. Jackson*, 499 S.W.2d 467, 471–72 (Mo.1973); *State v. Whiteaker*, 499 S.W.2d 412, 418 (Mo.1973), *cert. denied*, 415 U.S. 949, 94 S.Ct. 1472, 39 L.Ed.2d 565 (1974); *State v. Stevens*, supra, at 24; and *State v. Moore*, supra, at 65–66. They possess probative value if they enable the jury to better understand the facts elicited from various state witnesses, *State v. Wallace*, supra, at 72, *State v. Crow*, supra, at 256, *State v. Stevens*, supra, at 24, and *State v. Perkins*, 382 S.W.2d 701, 704 (Mo.1964); or if they corroborate the testimony of the state's witnesses, *State v. Wallace*, supra, at 72, *State v. Jackson*, supra, at 472, *State v. Stevens*, supra, at 24, *State v. Aubuchon*, 394 S.W.2d 327, 331 (Mo.1965), and *State v. Bozarth*, 361 S.W.2d 819, 825 (Mo.1962). They also have probative value if they aid in establishing any element of the state's case. *State v. Parsons*, supra, at 439; *State v. Damico*, supra, at 359; *State v. Jackson*, supra, at 472; and *State v. Clark*, supra, at 30. If possessed of probative value, they are not necessarily rendered inadmissible because of any cumulative aspect that may attach to them because of other evidence. *State v. Moore*, supra, at 65; *State v. Tyson*, 363 Mo. 1242, 258 S.W.2d 651, 654 (1953); *State v. Davis*, 515 S.W.2d 181, 183 (Mo.App.1974); and *State v. Bryant*, 507 S.W.2d 672, 673–74 (Mo.App.1974).

The colored slide reproductions of which the defendant complains are concededly gruesome, repugnant and shock provoking. They could not be otherwise, because they graphically and accurately portray the vicious and brutal nature of the assaults committed upon the victims of the homicides. Notwithstanding their inflammatory nature, they met every test of probativeness heretofore set forth. They visually demonstrated the nature and location of the various wounds inflicted upon the victims, they enabled the jury to better understand the facts elicited from various state witnesses, and they tended to corroborate the testimony of certain witnesses called by the state. Last, but by no means least, they tended to prove various elements of the crimes for which defendant was on trial. It must be borne in mind that defendant pleaded not guilty to both charges of murder in the second degree, thereby making it incumbent upon the state to prove beyond a reasonable doubt the elements of murder in the second degree. Only circumstantial evidence was available to the state to carry this burden, as hereinafter becomes apparent when defendant's attack on the sufficiency of the evidence to support the guilty verdicts is reached. The probativeness of the colored slide reproductions relative to the elements of murder in the second degree cannot be minimized, where, as here, the state's case necessarily rested upon circumstantial evidence. Any inclination to condemn the admission and display of the colored slide reproductions because of sheer numbers is allayed when reminded that the two homicides were consolidated for trial with the acquiescence and consent of defendant. Because of the superior vantage point occupied by the trial court for balancing the probative value and the prejudicial effect of demonstrative evidence of this type, it is vested with broad discretion in admitting or rejecting such evidence. *State v. Parsons,* supra, at 439; *State v. Parker,* 509 S.W.2d 67, 70 (Mo. 1974); *State v. Jackson,* supra, at 472; *State v. Crow,* supra, at 255; and *State v. Stevens,* supra, at 24. This court is unwilling to ignore the superior vantage point occupied by the trial court and precipitately say that the colored slide reproductions were so inherently prejudicial and inflammatory as to outweigh their multifarious probative value. Since the record so cogently demonstrated, in numerous respects, the probative value of the colored slide reproductions, the trial court did not abuse its discretion in admitting them into evidence and permitting them to be projected before the jury.

Defendant's third point charges that the trial court erred in sustaining the state's objection to evidence proffered by defendant that his stepsister, who was originally scheduled to babysit with the male child on the fatal night in question, was thereafter assaulted by an individual resembling defendant, and further erred in sustaining the state's objection to a certain exhibit offered by defendant which purported to be a threatening note, signed the "Butcher", received by defendant's stepsister after she was assaulted. Defendant made offers of proof with respect to both. *State v. Umfrees,* 433 S.W.2d 284, 287–88 (Mo. banc 1968), regarding analogous charges of error, held: "Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime. *State v. Miller,* Mo., 368 S.W.2d 353, 359–360[10, 11]; *State v. Barrington,* 198 Mo. 23, 95 S.W. 235, 259. See also *State v. Watson,* Mo., 350 S.W.2d 763. The test generally for the admission of such evidence is stated in 22A C.J.S. Criminal Law § 622b, at page 451, as follows: 'The evidence, to be admissible, must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person. Disconnected and remote acts, outside the crime itself cannot be separately proved for such purpose; and evidence which can have no other effect than to cast a bare suspicion on another, or to raise a conjectural inference as to the commission of the crime by another, is not

admissible.' " Defendant's third point is totally devoid of merit and fails to afford him any relief.

■ Defendant submits in his fourth point that the trial court erred in permitting Gary Howell, one of the state's witnesses, to testify that in his opinion a cut on the palm side of defendant's right little finger (as revealed by one of the photographs taken of defendant at the Lee's Summit Police Headquarters) was caused by a stabbing action with a knife that "did not have a hilt" because "during the stabbing the knife will meet resistance and the hand will slip off of it and cut the finger". Witness Howell was "Chief Forensic Chemist" of the Regional Crime Laboratory and, among other duties, supervised criminal investigations at the scene by teams of specialists from the Regional Crime Laboratory. He was present at the scene of the homicides in question and supervised the investigation which was conducted. He had participated in the investigation of approximately four hundred homicides during his tenure with the Regional Crime Laboratory. Defendant did not object to witness Howell's qualification to render the opinion in question. Instead, defendant predicated his objection upon the singular ground that there was no evidence that any of the wounds inflicted upon either victim were caused by a stabbing motion with a sharp bladed instrument. Defendant argues that the record confirms that any wounds inflicted upon the victims attributable to a sharp bladed instrument were "incise cutting wounds".

The only authorities cited by defendant in support of his fourth point are "Scientific Evidence in Criminal Cases—Moenssem, Foundation Press, 1973" and "Black's Law Dictionary, Revised Fourth Edition, West Publishing Company". No page, chapter or other references are provided for either of the purported authorities. The following statement is found in the argument portion of defendant's brief: "Moenssens on *Scientific Evidence* in *Criminal Cases* has a subsection entitled *Incised Cuts, Stab* and *Chop Wounds*. An incised wound is linear, its length is greater than its depth. *Black's Law Dictionary* defines 'stab' as a wound inflicted by a thrust with a pointed instrument."

Defendant's fourth point is patently fallible. He arbitrarily assumes that an "incise wound" can only be caused by a weapon wielded parallel to a victim's body and a "stab" wound can only be caused by a weapon wielded perpendicular to a victim's body. Defendant conveniently ignores the fact that a weapon may be wielded in an infinite number of angles between parallel and perpendicular. A weapon wielded at an acute angle could be a stabbing motion and still cause an "incise" wound as both terms are defined in the purported authorities relied upon by defendant. A weapon initially wielded with a stabbing motion could change its course upon coming in contact with a victim's body and thereafter produce an "incise" type wound. For example, prior evidence adduced by the state showed that a wound found on the right side of victim Curtright's neck, and described as an "incise wound" penetrated clear to her spinal column. Such bespeaks a wound possessing attributes and characteristics of both a "stab" and an "incise" wound. An objective and realistic analysis of the record invalidates the inherent theory of defendant's fourth point. Defendant's fourth point, however ingenious it may be, is ruled against him.

Defendant's attack upon the sufficiency of the evidence to support the guilty verdicts is now reached. As a prologue for determining whether there was sufficient substantial evidence to support the guilty verdicts, certain established principles bearing on appellate review, as well as the elements of murder, second degree, will be set forth. This prologue is prefaced with the pungent reminder that the evidence relied upon by the state was circumstantial in nature.

■ The facts in evidence and all favorable inferences reasonably to be drawn therefrom must be considered in the light most favorable to the state and all evidence and inferences to the contrary must be dis-

regarded. *State v. Chase,* 444 S.W.2d 398, 401 (Mo. banc 1969); and *State v. McGlathery,* 412 S.W.2d 445, 447 (Mo.1967). When the state's case rests upon circumstantial evidence, "the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence." *State v. Ramsey,* 368 S.W.2d 413, 416 (Mo.1963). See also *State v. Thomas,* 452 S.W.2d 160, 162 (Mo.1970). However, the prevailing circumstantial evidence rule, supra, for purpose of application, is not narrowly construed, since "[i]n a case involving circumstantial evidence the circumstances need not be absolutely conclusive of guilty, and they need not demonstrate impossibility of innocence[;] . . . the mere existence of other possible hypothes*i*s is not enough to remove the case from the jury." *State v. Thomas,* supra, at 162. See also *State v. Maxie,* 513 S.W.2d 338, 343 (Mo.1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); and *State v. Taylor,* 445 S.W.2d 282, 284 (Mo.1969). When the offenses were committed and tried, the willful, premeditated killing of a human being with malice aforethought constituted murder in the second degree. *State v. Anderson,* 375 S.W.2d 116, 119 (Mo. 1964); *State v. Strong,* 339 S.W.2d 759, 764–65 (Mo.1960); and *State v. Archer,* 328 S.W.2d 661, 665 (Mo.1959).

■■■ A forensic pathologist called by the state testified that the cause of death of both victims was a cutting of their throats causing external hemorrhaging. From this testimony the jury could reasonably infer that the victims' deaths were caused by the calculated use of a deadly weapon upon vital parts of the victims' bodies. The jury could reasonably infer from the brutal nature of the multiple wounds inflicted upon each of the victims that they were intentionally killed under circumstances which could not be deemed justifiable or excusable. The jury could reasonably infer that the defendant committed the homicides from the collective import of the following evidence: (1) a man fitting defendant's general description was seen at the front door of the Berger unit of the duplex at approximately 11 P.M., and defendant testified, infra, that he was at the door at the same approximate time; (2) a latent left palm print, which matched defendant's left palm print, was lifted from the refrigerator located in the kitchen where the victims' bodies were discovered; (3) fresh scratch marks were present on defendant's right arm and fresh cuts or wounds were present on each of defendant's little fingers; (4) sometime before 11:45 P.M. defendant changed his clothes,[1] but not the boots he was wearing, at the unit of the duplex where he resided; (5) laboratory tests confirmed that "blood stains" found on defendant's right boot matched the "autopsy blood of Miss Sheilia Curtright with respect to the group and the enzymes"; (6) laboratory tests of defendant's left boot revealed an abrasion approximately the same width as a dark scuff mark found on the wall of the kitchen in the Berger unit of the duplex; (7) laboratory tests revealed that a lower rivet on the backstrap of defendant's left boot matched a small "striated mark" found on the wall of the kitchen in the Berger unit of the duplex; (8) smoke observed coming from the eaves of the duplex when the victims' bodies were discovered was produced by a fire of incendiary origin centered in the corner of the garage attached to the unit of the duplex occupied by defendant and his parents; and (9) firemen called to the scene had to forcibly enter the garage to put the fire out because all the doors, including the garage door, and the windows of the unit of the duplex occupied by defendant and his parents were locked.

■■■ A brief reference is made to certain evidence introduced by defendant and the effect which he attempts to attribute to it. Defendant took the stand and testified in his own behalf. He admitted going to the front door of the Berger unit of the duplex around 11 P.M. He knocked on the door and in response to his knock the door was partially opened by Sheilia Curtright. De-

---

1. These clothes were never found or accounted for.

fendant explained that his purpose in doing so was to ascertain the whereabouts of Mr. and Mrs. Berger at the time in order to secure some chairs which they had and which were needed at the dance he left. Defendant denied that he entered the Berger unit of the duplex on the night in question and vehemently denied that he killed the victims. He further testified that prior to returning to the dance he changed his clothes at his residence. After he changed his clothes he testified that he took them to his garage and placed them on a clothesline that was situated there. His explanation for doing so was that he fell and soiled his clothes as he was going to his car to leave the dance. He also gave an innocent account for the scratches on his arm and the cuts on his fingers. Defendant's testimony, and that of various witnesses called by him, sought to circumvent, discount, and destroy the reasonable inferences raised by the circumstantial evidence produced by the state. Defendant argues that the evidence which he offered did just that and therefore no viable inferences could be drawn from the evidence presented by the state. Defendant's argument in this respect is illuminated by a glaring fallacy. It was the jury's prerogative to disbelieve the contradictory testimony of defendant and that of the witnesses whom he called and it obviously chose to do so. *State v. Rose,* 325 S.W.2d 485, 487 (Mo.1959); and *State v. Turnbough,* 497 S.W.2d 856, 858 (Mo.App.1973).

The reasonable inferences which the jury was permitted to draw from the evidence compels the conclusion that there was sufficient substantial evidence to support the jury verdicts.

Judgments affirmed.

All concur.