**STATE of Missouri, Plaintiff–
Respondent,**

v.

**Robert F. HOY, Defendant–Appellant.**

**No. 27677.**

Missouri Court of Appeals,
Southern District,
Division Two.

April 19, 2007.

James R. Schumacher, Springfield, MO, for Appellant.

Casey Clark, Assistant Prosecuting Attorney, Springfield, MO, for Respondent.

GARY W. LYNCH, Judge.

Robert F. Hoy ("Defendant") appeals his conviction for the class B misdemeanor of driving while intoxicated, in violation of § 577.010.[1] On appeal, he challenges the sufficiency of the evidence supporting his conviction and the admission of expert testimony of the results of a drug recognition evaluation. We affirm.

## 1) *Factual Background*

Defendant was arrested for driving while intoxicated after he was involved in a motor vehicle accident, where he drove his semi-tractor into the rear of another vehicle. The witnesses the State called against him were: (1) Charles Smith, who observed defendant's driving immediately before the accident; (2) Donna Jansen, the driver of the other vehicle involved in the accident; (3) Officer Wayne Woods of the Springfield Police Department, who responded to the accident scene; (4) Corporal Cort Stuart of the Missouri Highway Patrol, who conducted a drug recognition evaluation on Defendant; and (5) Martin Lindenbusch, the Supervisor of Toxicology at the Missouri Highway Patrol Crime Lab in Jefferson City.

On his way to work around 8:00 to 8:30 a.m. on February 25, 2004, Smith first noticed Defendant's semi-tractor, which did not have a trailer attached, when it was blocking two different directions of traffic at an intersection on West Bypass, in Springfield. The tractor was in the middle of the intersection for thirty sec-

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

onds to a minute. Defendant finally turned onto West Bypass in front of Smith and proceeded in the same direction as Smith was traveling. Defendant was traveling in the right southbound lane at a speed much slower than surrounding traffic so that cars behind him had to dodge around him. Smith, traveling in the left southbound lane, quickly overtook Defendant, and just as he was about to pass by Defendant, the tractor driven by Defendant, without signaling or giving any indication it was going to change lanes, cut in front of Smith into the left southbound lane. Defendant then proceeded to move, again without signaling, into the left-turn lane, but came to a complete stop partially in the left-turn lane and partially blocking traffic in the left southbound lane. When he was cut off by Defendant, Smith had to brake and move to the right southbound lane. As he passed by Defendant's stopped tractor, Smith observed that it was in contact with the rear of the vehicle in front of it in the left-turn lane.

Jansen was in the left-hand turn lane waiting for the light to change to green when Defendant drove his semi-tractor into the rear of her vehicle. After the initial impact, Jansen put her vehicle in park and was exiting her vehicle when, without warning, the semi-tractor "lurched" forward, pushing her vehicle forward and almost knocking her off her feet. As Jansen approached Defendant, she observed that he "was very unkempt looking" and was "acting just not too … rational[.]" After the police arrived, Jansen observed that Defendant was not able to walk a straight line and that he was "walking really strange … [s]tepping really high."

Officer Woods, upon his arrival at the accident scene, noted that Defendant appeared confused, paused while answering questions, had slurred speech, leaned when he walked as if off balance, had difficulty removing his license from his wallet, and had staring and constricted eyes. Officer Woods then conducted several field sobriety tests on Defendant at the scene of the accident to determine if Defendant was capable of operating a vehicle.

Defendant could not follow the instructions necessary to complete the horizontal gaze nystagmus (HGN) test, but Officer Woods detected two clues during the test before it was aborted. According to Officer Woods, a score of four clues indicates a 77% chance of a blood-alcohol content (BAC) above 0.10%.

Next, during the walk-and-turn test, Officer Woods detected five of the test's eight possible clues. Officer Woods also testified that a score of two clues indicates a 68% chance of a BAC above 0.10%.

Defendant then performed the one-leg-stand test. Defendant scored four of the possible five clues on the one-leg-stand test. As related by Officer Woods, a score of two clues on this test indicates a 65% chance of BAC above 0.10%. Officer Woods came to the conclusion that Defendant was impaired, and he arrested Defendant for driving while intoxicated.

Officer Woods never smelled any odor on Defendant's breath and came to the additional conclusion that Defendant's impairment was due to drugs. Defendant was given a breathalyzer exam which showed a BAC of 0.00%. Officer Woods then turned Defendant over to Corporal Stuart of the Missouri Highway Patrol for a drug recognition examination ("DRE").

Corporal Stuart is certified by the International Association of Chiefs of Police as a drug recognition expert.[2] He has received seventy-two hours of specialized

---

2. We note that a witness is not considered an "expert" witness unless and until a proper

training in the detection of impaired drivers where impairment is caused by a drug other than alcohol. That training teaches one to detect and distinguish between seven different drug categories that cause impairment. The DRE is a standardized, twelve-step evaluation process used to evaluate whether an individual is impaired by a drug other than alcohol. Corporal Stuart conducted the DRE on Defendant and concluded, from its results, that Defendant was under the influence of a narcotic analgesic and a central nervous system depressant. Corporal Stuart also concluded that Defendant was unable to safely operate a vehicle. At some point during the examination, Defendant told Stuart that he had taken a sleeping pill the night before and pain medications the morning of the accident.

Defendant then provided a urine sample that was tested for the presence of drugs. Martin Lindenbusch, the Supervisor of Toxicology at the Missouri Highway Patrol, testified that results of his testing showed that Defendant's urine specimen contained hydrocodone, an analgesic drug, and zolpidem, a sleeping pill classified as a central nervous system depressant. He also testified as to the effects and symptoms of hydrocodone and central nervous system depressants on the body. He further testified that both can cause intoxication. The parties stipulated on the record that Lindenbusch was "not going to be able to testify as to the amount of drug begin [sic] over a certain threshold and being able to impair [Defendant]."

## 2) *Procedural Background*

Defendant was charged with three offenses: Count I charged Defendant with driving while intoxicated by operating "a motor vehicle while under the influence of a drug or drugs"; Count II charged Defendant with failure to maintain financial responsibility by operating a motor vehicle without insurance; and Count III charged Defendant with careless and imprudent driving. After a court trial, Defendant was convicted of driving while intoxicated and careless and imprudent driving, but acquitted on failure to maintain financial responsibility. Defendant appeals his conviction for driving while intoxicated and raises two points: (1) the conviction was not supported by sufficient evidence; and (2) the trial court erred in its admission of the DRE results.

## 3) *Sufficiency of the Evidence*

In his first point, Defendant challenges the sufficiency of the evidence for the trial court to find the defendant guilty beyond a reasonable doubt of operating a motor vehicle while intoxicated on a drug or drugs. Defendant does not challenge that he was operating a motor vehicle at the time of the alleged offense, but rather, he challenges only the sufficiency of the evidence supporting that he was doing so in an intoxicated condition. Because Defendant's blood-alcohol content was zero on the chemical test of his urine specimen, we must address Defendant's sufficiency-of-the-evidence claim within the framework of § 577.037. *State v. Falcone*, 918 S.W.2d 288, 292 (Mo.App.1996). That statute provides, in pertinent part:

5. Any charge alleging a violation of section 577.010 ... shall be dismissed with prejudice if a chemical analysis of

foundation has been laid as to his qualifications. It has been suggested that a more appropriate title would be drug recognition examiner or evaluator. *Williams v. State*, 710 So.2d 24, 37 n. 23 (Fla.App. 3 Dist.,1998). In

the instant case, we are confident that the trial court was not confused or misled by use of the title "drug recognition expert." However, we have concerns that the use of this title could possibly confuse or mislead a jury.

the defendant's ... urine ... demonstrate [sic] that there was less than eight-hundredths of one percent of alcohol in the defendant's blood unless one or more of the following considerations cause the court to find a dismissal unwarranted:

\* \* \* \*

(2) There is evidence that the defendant was under the influence of a controlled substance, or drug, or a combination of either or both with or without alcohol; or

(3) There is substantial evidence of intoxication from physical observations of witnesses or admissions of the defendant.

Section 577.037.5. By the explicit terms of this statute, Defendant is exonerated "of driving while intoxicated unless the requirements of either subdivision 2 or subdivision 3 of subsection 5 are met." *Falcone*, 918 S.W.2d at 292.

### A) *Standard of Review*

 In Missouri, the findings of a court-tried case have the force and effect of a jury verdict. *State v. Booyer*, 87 S.W.3d 926, 928 (Mo.App.2002); *State v. Northern*, 472 S.W.2d 409, 411 (Mo.1971). Review is the same as if a jury had returned a verdict. Rule 27.01(b); *State v. Giffin*, 640 S.W.2d 128, 130 (Mo.1982). In determining the sufficiency of the evidence to support a conviction, this Court accepts as true all evidence that is favorable to the State and any favorable inferences that can be drawn from such evidence. *State v. Owen*, 869 S.W.2d 310, 311 (Mo.App.1994). Any contrary evidence or inferences are disregarded. *Id.* When a challenge alleges insufficiency of the evidence in a criminal case, our review is limited to a determination as to whether there is sufficient evidence from which the trial court might have found the defendant guilty beyond a reasonable doubt. *Id.* We do not weigh the evidence except to determine whether there was sufficient evidence from which the trial court could reasonably have found the defendant guilty. *State v. Wilson*, 846 S.W.2d 796, 797 (Mo.App.1993).

### B) *Analysis*

Section 577.010.1 provides that a "person commits the crime of 'driving while intoxicated' if he operates a motor vehicle in an intoxicated or drugged condition." Section 577.001.3 sets out that "a person is in an 'intoxicated condition' when he is under the influence of alcohol, a controlled substance, or drug, or any combination thereof." "Under the influence of alcohol" has long been described as "[a]ny intoxication that in any manner impairs the ability of a person to operate an automobile." *State v. Raines*, 333 Mo. 538, 62 S.W.2d 727, 729 (1933). *See also State v. Cox*, 478 S.W.2d 339, 341–42 (Mo.1972); *State v. Adams*, 163 S.W.3d 35, 37 (Mo. App.2005); *State v. Wilson*, 846 S.W.2d 796, 798 (Mo.App.1993).

"Drugged condition," as used in § 577.010.1, is not defined in the statutes. As this Court noted in *Falcone*, the degree to which one must be affected by a drug to be "under the influence" of it is not spelled out. *Falcone*, 918 S.W.2d at 291. However, in *Falcone*, this court addressed the criteria for proving a driver is in a "drugged condition," within the meaning of § 577.010.1. *Id.* There, relying upon *Raines* and *Cox*, we held that if a defendant is under any influence of a drug to the "extent that it impaired her ability, in any manner, to operate her vehicle, she was in a drugged condition and consequently guilty of driving while intoxicated[.]" *Id.* at 291–92. We held this definition of "drugged condition" to be in accord with our Supreme Court's statement on this issue in *State v. Meanor*, 863 S.W.2d

884, 888 (Mo. banc 1993), where the Court noted:

> Other jurisdictions having statutes similar to Missouri's [3] have concluded that the proof required to establish driving under the influence of drugs should be no greater and no different from the proof required to establish driving under the influence of alcohol, other than the evidence must relate to the particular substance involved. "There is no reason why the same level of proof should not suffice to support a conviction for driving under the influence of drugs." (Citation omitted).

By defining "drugged condition" in this manner, we have in all respects equated it with the definition of "intoxicated condition" in § 577.001.3. As such, the two terms have been and may continue to be used interchangeably. *See, e.g., State v. Friend,* 943 S.W.2d 800, 801–02 (Mo.App. 1997) (referred to *Meanor* as discussing "the necessary standard of proof for driving in a drugged condition" when the statute upon which *Meanor* was premised only defined intoxicated condition). However, for the sake of consistency and ease of analysis in this opinion, we will use the term "intoxicated condition."

Based upon *Raines* and *Falcone, supra,* and as particularly articulated by the above quotations from each case, a determination that a defendant is "under the influence" of a proscribed substance (alcohol, controlled substance, or drug) to satisfy the "intoxicated condition" element [4] of the offense of driving while intoxicated under § 577.010.1, is composed of three components: (1) *impaired ability*—the defendant's impaired ability in any manner to operate a motor vehicle at the time of the alleged offense; (2) *presence of the substance*—the presence of the proscribed substance in the defendant's body at the time of the alleged offense; and (3) *causation*—the causal connection between the presence of the proscribed substance and the impaired ability to operate a motor vehicle. If any component is not supported by sufficient evidence, then the intoxicated-condition element of the offense is not supported by sufficient evidence, and the defendant's conviction cannot stand. *See State v. Clarkston,* 963 S.W.2d 705, 714 (Mo.App.1998); *Friend,* 943 S.W.2d at 803.

The sufficiency of the evidence necessary to uphold a conviction for driving while intoxicated involving drugs has previously been addressed in only five cases— *Meanor, Owen, Falcone, Friend,* and *Clarkston, supra.* A review of the evidence adduced and the holding in each case assist in our analysis of the sufficiency of the evidence in the case at bar.

### Meanor

In *Meanor,* 863 S.W.2d 884, the State contended that the defendant was intoxicated by a combination of alcohol and mar-

---

**3.** The court was relying upon § 565.002(4), RSMo 1986, which provided: " '*Intoxicated condition*' means under the influence of alcohol, a controlled substance, or drug, or any combination thereof[.]" This definition is identical to the definition of "Intoxicated condition" in § 577.001.3. *State v. Cox,* 836 S.W.2d 43, 48 n. 10 (Mo.App.1992). Neither definition has been amended since, although the definition in Chapter 577 was renumbered from § 577.001.2 to § 577.001.3 in 2005.

**4.** Many driving-while-intoxicated cases involving alcohol do not require an analysis of the three components comprising the "intoxicated condition" element of the offense because of the presumption of intoxication created by § 577.037.1, which provides: "If there was eight-hundredths of one percent or more by weight of alcohol in the person's blood, this shall be prima facie evidence that the person was intoxicated at the time the specimen was taken." § 577.037.

ijuana at the time that he drove his vehicle on the wrong side of the road and collided with an oncoming car. *Id.* at 887. The defendant's BAC was .02%. *Id.* This blood sample was insufficient to be tested for the presence of drugs. *Id.* The Highway Patrol officer at the accident scene testified that defendant smelled of intoxicants and of burnt marijuana after the accident, that marijuana and a device to smoke marijuana were found within defendant's easy reach after the accident, that the inside of defendant's pickup smelled of burnt marijuana, and that, in her opinion, the defendant was intoxicated. *Id.* Finding that "[t]he cause of such intoxication, ingestion of a combination of alcohol and marijuana, is clearly inferable from the circumstantial evidence in this case[,]" our Supreme Court denied the defendant's claim that the evidence was insufficient to establish that he was under the influence of drugs and alcohol. *Id.* at 888.

The evidence of Meanor's impaired ability to operate a vehicle consisted of direct evidence that the defendant drove on the wrong side of the road in the face of an oncoming vehicle. *Id.* at 887. The presence of the proscribed substances, alcohol and marijuana, in the defendant's body was supported by the direct evidence of the scientific test result showing the defendant's blood-alcohol content, the odor of alcohol on the defendant's person, and the reasonable inference that the defendant used marijuana, drawn from the circumstantial evidence of the close presence of marijuana along with a device to smoke it and the smell of burnt marijuana on the defendant and in his truck. *Id.* at 887–88. The evidence that the presence of the proscribed substances caused the defendant's impaired ability was the officer's lay opinion that the defendant was intoxicated, coupled with the reasonable inference from the circumstantial evidence that defendant had recently consumed alcohol and mari-

juana, and the direct evidence of observations of the defendant exhibiting signs of impaired judgment and motor skills consistent with intoxication. *Id.* at 888.

### Owen

In *Owen,* 869 S.W.2d 310, the defendant's vehicle, in which he was the sole occupant, was involved in a collision with another vehicle on the highway. *Id.* at 312. According to the first officer on the scene, the defendant was stumbling, had slurred speech, had the odor of alcohol on his breath, had bloodshot, glassy, and staring eyes, used vulgar language, and failed each of the field sobriety tests. *Id.* In the officer's opinion, the defendant's driving ability was impaired by reason of the effects of alcohol or drugs. *Id.* Marijuana and paraphernalia for the use of it were found in the defendant's vehicle. *Id.* Defendant admitted that he was operating the vehicle, that he had been drinking that night, and that he had a beer or two. He also admitted that he did use marijuana, that he had used marijuana, and that all the law officers would not be able to stop him until the day he died. *Id.* The defendant's urine specimen, taken shortly after the accident, "contained evidence of marijuana, cocaine, and alcohol." *Id.* The State charged the defendant with "operating a motor vehicle while under the influence of a combination of alcohol and marijuana, a controlled substance." *Id.* at 311–12. We held that the evidence was sufficient to support his conviction on this charge. *Id.* at 312.

Owen's impaired ability to operate a vehicle was supported by the direct evidence of his actions as observed by the officer and by the officer's lay opinion that defendant was impaired. *Id.* at 311. Evidence of the presence of the proscribed substances, alcohol and marijuana, in the defendant's body included the direct evidence

of the scientific test of defendant's urine, direct evidence of defendant's consumption by his own admissions, and the reasonable inferences drawn from the circumstantial evidence of the presence of marijuana and its paraphernalia. *Id.* The causal connection between the presence of the proscribed substances and the defendant's impaired ability to operate a vehicle was supported by the lay opinion of the officer that defendant was impaired by reason of the effects of alcohol or drugs. *Id.*

### *Falcone*

In *Falcone*, 918 S.W.2d 288, the vehicle driven by defendant struck a bridge. *Id.* at 290. According to the arresting officer, the defendant was talking to herself, acting strangely, failed two field sobriety tests, and kept walking out into the lane of traffic. She tested "[z]ero, zero" for alcohol on the breathalyzer. *Id.* Defendant admitted to the arresting officer that she took Lorazepam three times a day, per her doctor's instruction, with the last one having been taken about two hours before the accident. *Id.* Defendant gave a urine sample, which tested positive for benzodiazepine, and the testimony regarding that sample of the Director of the Regional Crime Lab in Joplin, a chemistry professor, was quoted by the court as follows: "Lorazepam is a specific drug that's one of a number of compounds that are known as benzodiazepines, in general. . . . [B]enzodiazepines are a class of drugs. In addition to Lorazepam, there's also Diazepam, chlordiazepoxide and several others." On the issue of whether his findings established that [defendant] was intoxicated at the time she furnished the urine specimen, the director's testimony was:

> Q. Can you render an opinion, as based on what you found in the urine sample you had, as to whether or not that particular individual was intoxicated on benzodiazepine? . . .

> A. No, sir.

> Q. Could you say whether that person would have been in any way impaired from driving an automobile?

> A. . . . . I don't have levels, and I can't say in this specific case. In general terms, both the Phenobarbital and whichever benzodiazepine act as a sedative, sort of in a sedative fashion.

> Q. So on a certain amount, it may, in fact, impair and intoxicate someone, correct?

> A. Correct.

> Q. But you couldn't say whether or not this was enough?

> A . . . . Both the Phenobarbital and whatever benzodiazepine was there were above the threshold levels that we use, which are indications that, above these levels, there is normally an effect on—on sensory and motor perception.

*Id.* at 290–91. No witness expressed an opinion that the defendant was intoxicated. *Id.* at 291. We held that this evidence was sufficient to satisfy both subdivisions 2 and 3 of § 577.037.5, such that the defendant "was not entitled to dismissal even though there was no evidence that she had any alcohol in her blood." *Id.* at 293. We also held that the trial court could reasonably find from such evidence, beyond a reasonable doubt, that the cause of defendant's impairment was Lorazepam and that the evidence was sufficient to support the defendant's conviction for driving while intoxicated. *Id.*

Evidence of Falcone's impaired ability to operate a motor vehicle included the direct evidence that she drove her vehicle such that she struck a bridge, she was talking to herself and acting strangely, she kept walking out into traffic, and she failed two field sobriety tests. *Id.* at 290. The presence of the drug benzodiazepine in the defendant's body was evidenced by the

direct evidence of the scientific test results on the defendant's urine specimen. *Id.* Evidence of the causal connection between the defendant's impaired ability and the presence of benzodiazepine included the direct evidence of the expert's opinion that Lorazepam is a drug within the class of drugs known as benzodiazepines, coupled with the direct evidence of the defendant's admission that she had recently ingested Lorazepam, the reasonable inference that the defendant's sensory and motor perception was affected by the presence of Lorazepam derived from the circumstantial evidence of the expert opinion that in general benzodiazepines act as a sedative and that the threshold level of the drug would affect a normal person's sensory and motor perception, and the direct evidence of the defendant's observed exhibition of signs of impaired judgment and motor skills consistent with intoxication. *Id.* at 293.

### Friend

In *Friend,* 943 S.W.2d at 800, the defendant was stopped for driving in the wrong direction on I–70. *Id.* at 801. The arresting officer smelled no odor of alcohol on the defendant, who was very nervous and jumpy. *Id.* The defendant told the officer that Mexicans were chasing him and were out to kill him and to cut his throat. *Id.* The defendant's pupils were constricted, and he failed two field sobriety tests. *Id.* When another officer asked the defendant to exit the police car, "the defendant began to ramble about 'which one of you is going to kill me' and 'I guess this is it.'" *Id.* The breathalyzer test administered on the defendant registered zero for the presence of alcohol. Unable to give a urine sample, the defendant agreed to a blood sample, which was taken and tested positive for methamphetamine. *Id.* At the jail, the defendant was observed screaming, yelling, kicking at the ceiling, and punching the wall. *Id.* He had to be restrained.

*Id.* "There was no testimony as to the amount of methamphetamine in his system, the effect of the methamphetamine on his driving ability, or whether it would cause the behavior the defendant exhibited." *Id.*

Based upon these facts, the Western District of our Court noted that "the decisive point is that the behavior, which evidences impaired judgment and motor skills, must be consistent with the symptoms of the ingested drug." *Id.* at 802. Concluding that, under the facts presented, there was insufficient evidence to support the defendant's conviction for driving in an intoxicated condition, the Court stated: "There was no evidence to show that defendant's behavior, while abnormal, was consistent with identifiable symptoms of ingestion of methamphetamine that would impair the defendant's ability to drive." *Id.* at 803.

Friend's impaired ability to operate a motor vehicle was evidenced by the direct evidence of his actions in driving the wrong way on I–70, his delusional and paranoid statements, and his failure of two field sobriety tests. *Id.* at 801. The presence of methamphetamine in the defendant's body was supported by the direct evidence of the expert opinion of the scientific test showing its presence. *Id.* However, there was no evidence presented showing a causal connection between the presence of methamphetamine in the defendant's body and the defendant's impaired ability to operate a motor vehicle. *Id.*

### Clarkston

Finally, in *Clarkston,* 963 S.W.2d 705, the defendant was an insulin-dependent diabetic. *Id.* at 708. On the day in question, he last took his morning insulin at 7:00 a.m. *Id.* He worked all day, and

around 8:00 p.m., he went to a bar and drank some beer. *Id.* Sometime between 9:30 p.m. and 10:00 p.m., the vehicle driven by the defendant collided with the rear of another vehicle stopped at an intersection. *Id.* When approached by the other driver, the defendant stared "straight ahead and down" and failed to respond to the other driver. *Id.* The first officer on the scene noticed the smell of alcoholic beverages on the defendant and that his eyes were watery, glassy, and bloodshot. *Id.* The defendant failed the horizontal gaze nystagmus test and refused to take any other field sobriety tests, claiming he was "too drunk." He also refused to take a chemical breath test. *Id.* The defendant admitted he had drunk between eight and eleven beers. *Id.* Based upon these facts, the State charged defendant with driving while intoxicated while under the influence of alcohol and a combination of alcohol and insulin. On appeal, the defendant claimed that the evidence did not support the submission to the jury of intoxication based on a combination of alcohol and insulin. The Western District of our Court concluded:

> Thus, in order to prove intoxication with a combination of alcohol and insulin, the State had to show that the insulin Mr. Clarkston had taken at 7:00 a.m. that morning was still sufficiently in his system and combined with the alcohol to cause his intoxication. There was no such testimony. *There simply was no evidence as to how much, if any, insulin would have remained in his system by 9:30 p.m. that evening.*
>
> * * *
>
> For these reasons, we find that here, as in *Friend,* there simply was no evidence to support the submission that Mr. Clarkston's intoxication was related to the particular drug alleged, insulin, and no evidence to support the argument

that insulin combined with alcohol to cause Mr. Clarkston's intoxication. *Id.* at 714 (emphasis added).

Evidence of Clarkston's impaired ability to operate a vehicle included the direct evidence of his actions in driving into the rear of another vehicle, the reasonable inference from the direct evidence that he failed to respond to the other driver, and the reasonable inference from his admission that he was "too drunk" to perform field sobriety tests. *Id.* at 708. There was no evidence to support that insulin in any amount was present in the defendant's body at the time of the alleged offense. *Id.* at 714. Without such evidence, no causal connection could be made between insulin and the defendant's impaired ability to operate a motor vehicle. *Id.*

### Application to Defendant in this Case

#### a. Impaired Ability

◼ With the foregoing in mind, we proceed to analyze the sufficiency of the evidence in the instant case. The evidence supporting Defendant's impaired ability to operate a motor vehicle at or near the time of the alleged offense included the direct evidence that: Defendant blocked traffic in both directions at an intersection for thirty to sixty seconds; Defendant drove slowly; Defendant changed lanes without signaling and in a manner to cut off Smith; Defendant drove into the rear of another stationary vehicle and then allowed or directed the semi-tractor to "lurch" again into the other vehicle; Defendant was "unkempt looking," was not acting rational, could not walk a straight line, was stepping really high, appeared confused, paused while answering questions, had slurred speech, leaned when he walked as if off balance, had difficulty removing his license from his wallet, and had droopy eyelids; Defendant could not follow the instructions necessary to complete the HGN test; and the results

of the walk-and-turn test and the one-leg-stand test indicated that Defendant was impaired. Defendant's impaired ability was also supported by the lay opinion of Officer Woods that Defendant was impaired.

### b. Presence of Substance

The presence of the drugs hydrocodone and zolpidem in Defendant's body at or near the time of the alleged offense is supported by the direct evidence of the expert opinion by Lindenbusch that scientific tests performed on the urine specimen provided by Defendant within a short time after his arrest and reasonably close to the time of the alleged offense, showed the presence of both drugs in Defendant's system.

### c. Causation

The causal connection between the presence of hydrocodone and zolpidem in Defendant's body and Defendant's impaired ability to operate a motor vehicle is supported by the following evidence. Officer Woods gave direct evidence of his lay witness opinion that defendant was impaired due to drugs. *See Meanor*, 863 S.W.2d at 888 (intoxication sufficient to sustain conviction may be proved by lay witness who has had reasonable opportunity to observe alleged offender). There was direct evidence that Defendant admitted ingesting pain medication on the morning of the alleged offense and medication for a sleep disorder on the evening before the alleged offense. Lindenbusch provided direct expert evidence that hydrocodone is a pain medication and zolpidem is a sleeping pill. The trial court could reasonably infer from this direct evidence that Defendant ingested hydrocodone on the morning of and within a few hours before the alleged offense and that he ingested zolpidem the evening before the alleged offense. There

was also circumstantial expert evidence by Lindenbusch that both of these drugs can cause sleepiness, slowed reaction times, central nervous system depression (sedative effect), lack of coordination, slurred speech, and slower movements. Additionally, he testified that both can cause intoxication. The trial court could reasonably infer from this circumstantial evidence that the presence of these two drugs in Defendant's body could cause Defendant to exhibit sleepiness, slowed reaction times, central nervous system depression (sedative effect), lack of coordination, slurred speech, slower movements, and intoxication. The direct evidence of Defendant's impaired ability to operate a motor vehicle, as described above, also directly evidences that at the time of the alleged offense, Defendant was sleepy and sedated, had slowed reaction times, lacked coordination, had slurred speech, moved slowly, and was intoxicated. The results of the breathalyzer provided direct scientific evidence that Defendant had no alcohol present in his body at the time of the alleged offense. The trial court could reasonably infer from this that Defendant's impaired ability to operate a motor vehicle came from some source other than alcohol. The trial court could reasonably infer from the totality of the direct and circumstantial evidence, as recited previously in this paragraph, that the presence of the drugs hydrocodone and zolpidem in Defendant's body at or near the time of the alleged offense caused Defendant's impaired ability to operate a motor vehicle at that time, and that, therefore, Defendant was under the influence of those drugs. *See id.*

This evidence, as viewed in the light most favorable to the State, is sufficient to deny dismissal of the charge of driving while intoxicated under both subdivisions (2) (under the influence of a drug) and (3) (substantial evidence of intoxication from physical observations of witnesses or ad-

missions of the defendant) of § 577.037.5. *See Falcone*, 918 S.W.2d at 293. Accordingly, we hold that Defendant was not entitled to dismissal "even though there was no evidence that [he] had any alcohol in [his] blood." *Id.* Likewise, this evidence is sufficient to support the Defendant's conviction for driving while intoxicated. *Id.*

Defendant asserts that *Falcone* requires the State to produce evidence of recent ingestion of the drug or drugs in a threshold amount that normally affects one's sensory and motor perception. Defendant then couples this assertion with the State's stipulation that Lindenbusch could not so testify to conclude that the evidence was insufficient to support Defendant's conviction. Defendant misinterprets the holding of *Falcone*. We announced the criteria by which to measure the evidence presented, but we set no requirements upon the type of evidence that the State must produce to prove that a defendant was in an intoxicated condition. *Falcone*, 918 S.W.2d at 291–92. We simply considered whether the evidence presented by the State in that particular case—that the defendant had ingested a drug in "an amount that normally affects one's sensory and motor perception,"—was *sufficient* evidence to support the causal connection between the presence of Lorazepam in the defendant's body and the defendant's impaired ability to operate a motor vehicle. *Id.* at 293. We in no way established that particular evidence as a minimal standard required in all cases for proving an intoxicated condition. *Id.*

Defendant also asserts: "One could speculate that the cause of Appellant's perceived impaired behavior was his medical condition.... Convictions are not based on speculation but on proof beyond a reasonable doubt." This assertion essentially challenges the trial court's authority to rely upon circumstantial evidence and reasonable inferences drawn from that circumstantial evidence to support its judgment. However, " 'Missouri no longer follows the rule which, in a circumstantial evidence case, required that the evidence must be inconsistent with any reasonable theory of defendant's innocence in order to support a conviction.' " *Meanor*, 863 S.W.2d at 886 (quoting *State v. Grim*, 854 S.W.2d 403, 406 (Mo. banc 1993)); *Owen*, 869 S.W.2d at 311. Of course, the trial court was free to disbelieve or disregard any or all of the evidence of Defendant's alleged medical condition. *Falcone*, 918 S.W.2d at 292.

Based upon the above and foregoing analysis of the evidence, we determine that Defendant's conviction for driving while intoxicated was supported by sufficient evidence from which the trial court might have found the defendant guilty beyond a reasonable doubt. Point I is denied.

### 4) *Applicability of Frye Test to Drug Recognition Evaluation Results*

■ In his second point, Defendant claims that the results of the DRE performed by Corporal Stuart were improperly admitted by the trial court. Defendant argues, for the first time on appeal, that Corporal Stuart's testimony of such results should not be admitted because the procedure of the test is not "sufficiently established to have gained general acceptance in the particular field in which it belongs," as required by *Frye*.[5] In criminal cases in Missouri, the *Frye* test requires that a party seeking to introduce the results of a specific scientific test or process into evi-

---

**5.** *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923) (where the court held that scientific evidence may be admitted only if it is suffi-ciently established that it has gained general acceptance in the relevant scientific community).

dence must show that the test has gained general acceptance in the particular field in which it belongs. *State v. Stout,* 478 S.W.2d 368, 371–72 (Mo.1972).

### Standard of Review

■ Preservation of evidentiary questions for appeal requires an objection at the time the evidence is sought to be introduced along with the same objection being carried forward on appeal. *Rogers v. B.G. Transit Corp.,* 949 S.W.2d 151, 153 (Mo. App.1997). An objection to the admissibility of evidence must be specific. *Carter v. St. John's Reg'l Med. Ctr.,* 88 S.W.3d 1, 19 (Mo.App.2002). The purpose of this rule is to ensure that the trial court is informed of the reasons of the objection so that it can thereby make a reasoned and informed ruling. *Id.* Any grounds that are not raised in the objection are considered waived, and a party is prevented from raising such grounds for the first time on appeal. *Id.* at 18; *McHaffie v. Bunch,* 891 S.W.2d 822, 830 (Mo. banc 1995). Changing the grounds for the objection or broadening the grounds is also prohibited. *Firestone v. Crown Ctr. Redevelopment Corp.,* 693 S.W.2d 99, 106–07 (Mo. banc 1985). An appellate court will only reverse on a new basis for exclusion of evidence when plain error has occurred. *Nelson v. Waxman,* 9 S.W.3d 601, 605 (Mo. banc 2000).

### A) Analysis

■ At trial, the only objection Defendant made regarding the admissibility of the DRE results occurred when Corporal Stuart was asked by the State whether he had previously qualified in a Missouri court as an expert on the subject of persons driving under the influence of drugs. Defendant made the following objection:

> There's no Missouri case stating that a drug recognition expert is an expert to testify as to whether a person is under the influence of drugs and whether he is impaired in the state of Missouri. Furthermore, Your Honor, this is not a new and novel science. He's not an expert. I don't think he's subject to *Frye,* and we would ask the Court to declare him not to be an expert and not be able to give an opinion whether or not my client is under the influence of a particular drug and that he's impaired—his driving is impaired from that drug.[6]

Defendant's objection was not premised upon the results of the DRE being inadmissible under the *Frye* test, but rather that Corporal Stuart was not qualified to render an expert opinion on whether Defendant was under the influence of drugs or whether Defendant's driving was impaired from that drug. In fact, Defendant expressly advised the trial court in his objection that "this is not a new and novel science" and that *Frye* did not apply. In his point relied on, Defendant does not raise his original objection as stated to the trial court—that Corporal Stuart was not qualified to render an opinion—and it is, therefore, accordingly abandoned. *Nelson,* 9 S.W.3d at 605. Additionally, because Defendant's *Frye* contention asserted on appeal was not raised in the trial court, we must deem it waived. *McHaffie,* 891 S.W.2d at 830.

■ Despite Defendant's failure to properly preserve the *Frye* issue below,

---

**6.** After Defendant's objection was overruled, he was granted a continuing objection as to Corporal Stuart's expertise and as to the line of questioning regarding Corporal Stuart's conduction of the DRE on Defendant. We also note that the substance of Defendant's objection was first raised by the State in its Respondent's Brief. Defendant had an opportunity to reply to the State's contention that this objection failed to preserve the *Frye* issue for appellate review by filing a reply brief, but chose not to do so.

this Court may, in its discretion, review the issue for plain error. Rule 30.20.[7] Under plain error review, we will not reverse the trial court's admission of the DRE results unless we find a "manifest injustice or miscarriage of justice has resulted." *Id.* The burden of proving that a manifest injustice or miscarriage of justice has occurred is upon the defendant. *State v. Campbell,* 122 S.W.3d 736, 740 (Mo.App. 2004). To show plain error, the defendant must demonstrate more than mere prejudice; instead, Defendant must show manifest prejudice affecting a substantial right. *State v. Parker,* 856 S.W.2d 331, 332–33 (Mo. banc 1993).

In determining whether plain error exists, a reviewing court undergoes a two-step process. *State v. Goodine,* 196 S.W.3d 607, 617–18 (Mo.App.2006). First, the reviewing court must "determine whether the asserted claim of plain error facially establishes substantial grounds for believing a manifest injustice or miscarriage of injustice has occurred." *Campbell,* 122 S.W.3d at 740. If such grounds are found to exist, then this Court will determine whether manifest injustice or a miscarriage of justice has actually occurred. *Id.* If such grounds do not exist, then this Court will decline to exercise its discretion to engage in plain error review. *Id.*

■■■ Initially, we note that a law enforcement officer is allowed to testify as to his observations and opinions regarding intoxication. *State v. Scholl,* 114 S.W.3d 304, 307 (Mo.App.2003); *Meanor,* 863 S.W.2d 884, 887–88 (Mo. banc 1993); *State v. Powell,* 306 S.W.2d 531, 532–33 (Mo. 1957). Therefore, in regard to the DRE, the only testimony of Corporal Stuart that Defendant can challenge as improperly admitted in violation of *Frye* would be Corporal Stuart's opinions purportedly based upon scientific evidence concerning the categories of drugs present in Defendant's body and whether those drugs caused the impairments exhibited by Defendant.

However, the State also presented testimony by Lindenbusch, a toxicology expert whose qualifications and testimony Defendant has not challenged on appeal. Lindenbusch tested Defendant's urine, identified the drugs found in Defendant's system, and described the types of effects such drugs have on a person. This description coincided with the impairments exhibited by Defendant. In addition, Officer Woods testified without objection that in his lay opinion Defendant's impairment was due to drugs. *See Meanor,* 863 S.W.2d at 888; *Owen,* 869 S.W.2d at 312. The admission of the DRE results as to the categories of drugs in Defendant's body and whether those drugs caused Defendant's impairments cannot be said to have constituted a manifest injustice or miscarriage of justice when essentially the same evidence by the State's toxicology expert and by Officer Woods was properly admitted.

■■■ "To establish plain error due to the erroneous introduction of evidence, there must be apparent prejudice to the defendant." *Campbell,* 122 S.W.3d at 741 (citing *State v. Fuente,* 871 S.W.2d 438, 443 (Mo. banc 1994)). "Prejudice is not considered apparent when there is ample other evidence to support the conviction." *Id.* (also citing *State v. Jimmerson,* 891 S.W.2d 470, 472 (Mo.App.1994)). As discussed in our analysis of Defendant's first point, there was sufficient evidence to find Defendant guilty beyond a reasonable doubt of driving while intoxicated without any consideration of Corporal Stuart's

7. All references to Rules are to the Missouri Supreme Court Rules (2006), unless otherwise indicated.

opinion as to the categories of drugs in Defendant's system and whether those drugs caused Defendant's impairments.

▮ Additionally, Defendant's counsel affirmatively invited the trial court not to consider the applicability of *Frye* to Corporal Stuart's testimony. This invitation directed the trial court and the State away from the issue now asserted by Defendant on appeal and effectively denied the State and the trial court an opportunity to address it during the trial. In this situation, we are loath to paint the trial court with plain error for not *sua sponte* rejecting the proffered DRE results. Such self-invited error cannot be the basis for overturning the judgment in this case. As we observed in *Campbell,* 122 S.W.3d at 742:

> "No criminal trial or judgment should be affected, in any manner, by an error committed at the instance of the defendant." *State v. Williams,* 118 S.W.3d 308, 313 (Mo.App.2003). *See also State v. Burgin,* 633 S.W.2d 124, 125 (Mo.App. 1982) (an appellant is not entitled to complain about matters brought into the case by his own questions or take advantage of self-invited error); ... § 545.030.1(16).

For these reasons, we find no substantial grounds to facially establish a belief that a manifest injustice or miscarriage of justice has occurred by the admission of the DRE results, and we decline to exercise our discretion to grant plain error review. *Id.* at 740. Point II is denied.

### 5) *Decision*

The judgment of the trial court is affirmed.

GARRISON, J., and BARNEY, J., concur.