**STATE of Missouri, Plaintiff–Respondent,**

v.

**William R. HARTMAN, Defendant–Appellant.**

**No. 27926.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 31, 2007.

Irene Karns, of Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Lisa M. Kennedy, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Judge.

William R. Hartman ("Defendant") was convicted following a jury trial of committing murder in the second degree, in violation of § 565.021.[1] The court sentenced him as a prior and persistent offender under §§ 558.016 and 557.036 to a term of twenty-five years' imprisonment in the Department of Corrections. Defendant appeals, contending the trial court erred in admitting alleged hearsay testimony, giving a jury instruction on accomplice liability, and allowing the prosecutor to show enlargements of certain admitted photographs to the jury. We affirm.

## 1) *Factual and Procedural Background*

Defendant does not challenge the sufficiency of the evidence to support his conviction. Viewing the evidence in the light most favorable to the conviction, *State v. Stanley*, 124 S.W.3d 70, 72 (Mo.App.2004), the following facts were adduced at trial.

On February 4, 2003, Defendant and his wife, Sherry Hartman, entertained several friends at their home in Joplin, drinking and eating dinner together. Their guests included the victim, Alfred Smith ("Smitty"), Curtis Downton, and John Adams and his girlfriend, Tina Schacht. At some point in the evening, Defendant, Smitty and Downton began fighting. Smitty was yelling loudly, and Defendant and Downton pushed him out of the house. They then pushed Smitty off of the porch and into the street, where the three men continued to fight. When the men reached the other side of the street, Defendant "slew" Smitty into a ditch. Defendant then crushed Smitty's face with a rock. Defendant and Downton left Smitty lying in the ditch and returned to Defendant's house.

The next morning around 6 a.m., Adams woke up and left his house, which was near Defendant's house, to walk to work. As Adams walked by the ditch across from Defendant's house, he saw a body lying in the ditch. He ran to his landlord's house, told him about the body, and asked him to call 9–1–1. The men walked back over to the ditch and looked at the body; Adams then realized that it was Smitty.

Paramedics arrived at the scene and attached a cardiac monitor to Smitty to see if there was any cardiac activity; there was none. Sergeant Michael Hobson was the first officer to respond to the scene around 7:20 a.m. Smitty's body was lying face-up in the ditch with his face swollen and bloody. Sergeant Hobson recognized the victim as Alfred "Smitty" Smith. He then called in some other officers and secured the crime scene.

The pathologist who performed the autopsy determined that Smitty died as a result of severe blunt-force trauma to the face that caused a subdural hematoma. His injuries were consistent with being hit at least twice in the head. In the pathologist's opinion, the two rocks found at the scene lying on either side of Smitty's head could have caused his death if used with enough force. Red stains on the rocks were later determined to be human blood.

1. All references to statutes are to RSMo Cum. Supp.2003.

Based on information received from Adams, Detective Jim Wallace with the Joplin Police Department contacted Defendant, Downton and Schacht. At the police department, Detective Wallace interviewed Defendant after Defendant signed a written waiver of his *Miranda* rights.[2] Defendant admitted that he threw Smitty out of his house, followed him into the street where they fought, and then "slew" Smitty into the ditch. Defendant also said he returned to the ditch about ten minutes later and saw that Smitty was breathing and his face was bloody, but he walked away and left Smitty there because he was still angry with him. At that point, Detective Wallace ended the interview and had Defendant arrested for Smitty's murder.

After speaking with Downton, Detective Wallace interviewed Defendant again. Defendant signed another written waiver of his *Miranda* rights. Detective Wallace told Defendant he had spoken to Downton and did not believe that Defendant was telling him the complete truth. This time, Defendant said that Smitty had gotten loud and that he and Downton pushed Smitty out of the house and into the street where they continued fighting. Defendant said that when they reached the other side of the street, Defendant "slew Smitty into the ditch." Defendant described Smitty's body as lying on his side in the ditch with his feet pointed toward the road. Defendant said he and Downton left him there. About three to ten minutes later, Defendant went back to the ditch and saw that Smitty was breathing, but not bloody. Defendant said he went home and then checked on Smitty after another ten minutes; Downton went with him. Smitty was still in the ditch and was bloody. Defendant said he saw a rock on Smitty's face, but did not call the police because he knew that he would get into trouble for

assaulting Smitty. At that point, the interview was interrupted because Schacht had arrived at the police station. Detective Wallace spoke with Schacht separately and then resumed his interview of Defendant, after reminding him of his rights. Detective Wallace told Defendant that he "had gotten some information that [Defendant's] wife had made a comment that he told her that he threw the final blow." Defendant began to cry and said that he did not want to die in prison. Detective Wallace told him that the information was serious and he was going to go speak to Sherry, Defendant's wife, because she had lied to him earlier. Defendant said that he did not want Sherry to get into trouble. Detective Wallace told Defendant that he did not intend to arrest Sherry and asked why he thought Sherry was going to be in trouble. Defendant did not respond and Detective Wallace told him that he just needed the truth. Defendant stopped crying, looked Detective Wallace dead in the eyes, and said, "I killed the son of a bitch and I smashed—crushed his face with a rock." Defendant paused and then said that the only reason he confessed was because he did not want his wife to get into trouble. Detective Wallace asked Defendant for more details about the incident, and Defendant just looked at him and said, "I killed the son of a bitch; isn't that enough?"

Forensic analyses performed on Defendant's clothing, which was seized when he was arrested, revealed that Smitty's DNA was present in the blood found on Defendant's pants.

The state charged Defendant, as a prior and persistent offender under §§ 558.016 and 557.036, with committing the class A felony of first-degree murder in violation of § 565.020. Tina Schacht was murdered

**2.** See *Miranda v. Arizona,* 384 U.S. 436, 86   S.Ct. 1602, 16 L.Ed.2d 694 (1966).

before the trial, about six weeks after Smitty's death. Defendant filed a pre-trial motion in limine asking the court to exclude witnesses from repeating at trial any statements made by Schacht prior to her death. The court sustained that motion. At trial, the State presented the testimony of Detective Wallace, another detective, the pathologist who performed the autopsy, a forensic analyst, a paramedic, and other police officers. Defendant, his wife, and a DNA analyst testified on Defendant's behalf. After the close of the evidence and the attorneys' arguments, the jury convicted Defendant of second-degree murder, a class A felony. § 565.021. Thereafter, the court sentenced Defendant as a prior and persistent offender to a term of twenty-five years' imprisonment. §§ 558.016; 557.036. This appeal followed.

## 2) *Discussion*

### a) *Point I: Admission of Alleged Hearsay Testimony*

In his first point on appeal, Defendant contends the trial court erred in admitting over objection the testimony of Detective Wallace that he "had gotten some information that [Defendant's] wife had made a comment that [Defendant] told her that he threw the final blow." Defendant argues this testimony is inadmissible hearsay, in that "the testimony did not fall under any of the recognized exceptions to the evidentiary bar against hearsay evidence, and served to corroborate a confession that Defendant had disavowed." Defendant also asserts that the trial court granted his pre-trial motion in limine, ruling that witnesses could not repeat Schacht's statement, but could only testify as to what they did in response.

Trial courts have broad discretion in admitting or excluding evidence, and this court will not disturb the ruling absent a clear abuse of that discretion.

*State v. Robinson*, 111 S.W.3d 510, 513 (Mo.App.2003). "In reviewing the trial court's errors on direct appeal, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Manwarren*, 139 S.W.3d 267, 273 (Mo.App.2004).

"A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value." *State v. Sutherland*, 939 S.W.2d 373, 376 (Mo. banc 1997). "Generally, courts exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement was made." *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 120 (Mo. banc 1995). "However, exceptions to the general rule prohibiting hearsay statements do exist when the circumstances assure the trustworthiness of the declarant's statement." *Skay v. St. Louis Parking Co.*, 130 S.W.3d 22, 26 (Mo.App.2004).

The alleged hearsay statement at issue was offered by Detective Wallace while the prosecutor was questioning him about his interview of Defendant following Schacht's interruption:

Q. [by Prosecutor] Okay. You remind [Defendant] of his rights and then what happens?

A. [by Detective Wallace]: I tell him that I had gotten some information that his wife had made a comment that he told her that he threw the final blow.

Q. Okay. You confront [Defendant] with information, you say: I understand—.

BY [Defense Counsel]: Well, wait a second. Your Honor, can we approach?

THE COURT: Just state your objection. What's your objection?

BY [Defense Counsel]: I object to him repeating anything told to him by another witness.

BY [Prosecutor]: It doesn't make any sense to ask him-.

THE COURT: The objection is overruled.

Q. [by Prosecutor]: You confront [Defendant] by telling him you had information that [Defendant] told his wife, Sherry Hartman, that [Defendant] delivered the final blow to Smitty?

A. [by Detective Wallace]: Right.

The same subject arose later, during the prosecutor's cross-examination of Defendant:

Q. [by Prosecutor]: Now, didn't Officer Wallace tell you specifically that [sic] Tina [Schacht] had said?

A. [by Defendant]: Tina told—he told me that Tina said that my wife, Sherry, had told her that I delivered the final blow.

Q. Okay.

While defense counsel did object to Detective Wallace's testimony, he did not object to his own testimony on the same subject.[3] Defendant does not claim error with the admission of his testimony. Therefore, Detective Wallace's testimony was cumulative in that other properly-admitted evidence—Defendant's own testimony—established the fact that Defendant's wife said that Defendant told her he delivered the final blow. *State v. Nettles*, 216 S.W.3d 162, 165 (Mo.App.2006). Consequently, we need not determine whether the court erred in admitting Detective Wallace's testimony, because even if it did, Defendant is unable to establish prejudice. *State v. Nichols*, 200 S.W.3d 115, 120 (Mo. App.2006). "A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007). Point I is denied.

b) *Point II: Submission of Jury Instruction on Accomplice Liability*

■ In this case, the trial court submitted instructions to the jury for both first-degree murder and second-degree murder. The jury found Defendant guilty of second-degree murder. Defendant's second point claims the submission of the instruction on second-degree murder was erroneous because it was based on accomplice or accessorial liability and was unsupported by substantial evidence that Defendant and another person acted together (accomplice liability), or that Defendant aided another person (accessorial liability), in committing the murder.[4] The instruction read:

If you do not find the defendant guilty of murder in the first degree, you must

---

3. We note also that the filing of a motion in limine preserves nothing for appellate review unless the matter is also timely raised at trial. *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007).

4. We want to clarify that the instruction is not written in the disjunctive with a choice between accomplice liability and accessorial liability. The instruction is patterned off of MAI–CR.3d 304.04, which "applies when the evidence shows that the defendant acted with or aided another person or persons in the commission of an offense." Notes on Use 4, MAI–CR.3d 304.04. The second paragraph of the instruction simply explains the nature of accessorial liability; it is not asking the jury to choose between accomplice liability and accessorial liability. *State v. Thompson*, 112 S.W.3d 57, 65–66 (Mo.App.2003).

consider whether he is guilty of murder in the second degree.

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about February 5, 2003, in the County of Jasper, State of Missouri, the defendant or another person caused the death of Alfred L. Smith by striking him in the head with a blunt object, and

Second, that defendant or another person knew or was aware that his conduct was practically certain to cause the death of Alfred L. Smith,

Then you are instructed that the offense of murder in the second degree has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Third that with the purpose of promoting or furthering the commission of that murder in the second degree, the defendant acted together with or aided another person in committing that offense,

Then you will find the defendant guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

■ The trial court has discretion in deciding whether to submit a tendered jury instruction. *State v. Davis*, 203 S.W.3d 796, 798 (Mo.App.2006). Our review is limited to whether the trial court

abused its discretion in submitting the instruction. *Id.* Each theory within a submitted jury instruction must be supported by evidence which, if true, would support a verdict for the party submitting the instruction. *State v. Norman*, 145 S.W.3d 912, 921 (Mo.App.2004). In determining the sufficiency of the evidence to support the giving of an instruction, this court views the evidence in the light most favorable to the party giving the instruction, "taking all favorable inferences drawn from the evidence and disregarding all evidence and inferences to the contrary." *Id.*

"In order to submit the accomplice liability theory to the jury, the evidence must have supported a finding that (1) someone killed the victim; (2) this person acted with the intent to cause serious physical injury; and (3) the person acted together with or aided and encouraged the other person with the purpose of furthering the commission of the murder." *Id.* at 921–22.

Defense counsel's objection to the instruction at trial, and Defendant's argument on appeal, is that "the evidence in this case is either [Defendant] did it or Downton did it or that a third party did it[,]" but not Defendant and another person acting together. Our review of the record causes us to disagree, because when viewed in the light most favorable to the state, the evidence supports the conclusion that Defendant aided or acted with Downton in murdering Smitty. There was evidence that both Defendant and Downton fought with Smitty in the street, and that both men left Smitty lying in the ditch after Defendant threw him in there and smashed his head with a rock. Defendant confessed that he killed Smitty, and the evidence that he told his wife he "delivered the *final* blow[,]" along with the evidence Smitty was hit in the head at least twice and that two bloody rocks were found next to his head, reasonably infers another per-

son was acting with Defendant. There was evidence that Defendant and Downton returned later to find Smitty lying bloody in the ditch, and again left him there and returned to the house. Finally, DNA evidence showed that Smitty's blood was present on Defendant's clothing and human blood was present on Downton's pants.[5] There was sufficient evidence to support a finding that Defendant acted together with or aided Downton in causing Smitty's death. Therefore, the trial court did not abuse its discretion in submitting the instruction for second-degree murder to the jury. Point II is denied.

### c) Point III: Allowing Prosecutor to Show Enlargements of Admitted Photographs to Jury

▇▇▇ Defendant's third point claims the trial court abused its discretion in permitting the prosecutor to show enlargements of certain photographs to the jury. Eleven photographs of Smitty's body taken during the autopsy were admitted into evidence during the testimony of a detective who was present at the autopsy. Defense counsel did not object to the admission of the photographs. At a later point in trial, the prosecutor showed the same eleven photographs to the pathologist who performed the autopsy. The pathologist confirmed that the photographs fairly and accurately depicted the condition of Smitty's body during the various stages of the autopsy. The prosecutor then asked the court for permission to publish the photographs to the jury, to aid the pathologist as he testified about the details of the autopsy. Defense counsel objected, arguing the photographs

were "highly prejudicial" and their "prejudicial effect outweigh[ed] any probative value." After examining a few of the "worst" photographs,[6] the court overruled defense counsel's objection. Enlarged versions of the eleven photographs were projected onto a screen for the jury to see and for the pathologist to reference as he testified in detail about the autopsy.

Defendant now claims that the trial court erred in permitting the projected enlargements of seven of the eleven photographs. Defendant does not claim the seven photographs were improperly admitted into evidence, nor did he object to their admission at trial. He claims only that the manner in which the seven photographs were published to the jury was "unduly prejudicial."

▇▇▇ "Photographs, although gruesome, may be admitted where they show the nature and location of the wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the State's case." *State v. Rhodes,* 988 S.W.2d 521, 524 (Mo. banc 1999) (quoting *State v. Feltrop,* 803 S.W.2d 1, 10 (Mo. banc 1991) (citations omitted)). "The decision to publish evidence to the jury is within the discretion of the trial court." *State v. Wolfe,* 13 S.W.3d 248, 260 (Mo. banc 2000). An abuse of discretion exists only if the trial court's decision was clearly against reason and resulted in an injustice to Defendant. *Id.* at 260–61. "The projection of previously admitted photographs is permissible when the enlarged photographs serve legitimate purposes." *Tisius v. State,* 183 S.W.3d 207, 215 (Mo. banc 2006),

5. Although no DNA testing was performed on the human blood found on Downton's pants, given the other evidence of his involvement in the events surrounding Smitty's death, the jury could have reasonably inferred that this was Smitty's blood.

6. There is nothing in the record to indicate which specific pictures the trial court reviewed.

*cert. denied,* —— U.S. ——, 127 S.Ct. 83, 166 L.Ed.2d 75 (2006).

After reviewing the record, we have not found anything, and the Defendant has failed to direct us to anything other than the gruesome nature of the pictures, that indicates that the manner in which the enlarged photographs were projected before the jury did not serve a legitimate purpose, or that it had a prejudicial effect on the jury. Defendant has not articulated any facts or argument supporting his contention that the publication of the pictures in this manner was somehow prejudicial to Defendant while the admission of the pictures into evidence, which would be published to the jury in some manner, was not.

The projected enlargements had the legitimate purpose of illustrating the pathologist's testimony for the jury as he described the details of the autopsy showing the nature and location of the victim's wounds which led to his death. *See State v. Love,* 546 S.W.2d 441, 451–52 (Mo.App. 1976) (photographs "possess probative value if they enable the jury to better understand the facts elicited from various state witnesses"). There is no evidence in the record indicating the extent to which the photographs were enlarged when they were projected onto the screen before the jury or the proximity of the screen to the jury. Likewise, there is no evidence in the record of any adverse reactions by any juror or anyone else in the courtroom to the exhibition of the pictures in this manner. The lack of either of such types of evidence coupled with the legitimate purpose served by publishing the pictures in this manner and the trial court's superior position to view the proposed and actual manner of publishing the pictures to the jury, leaves us with no basis upon which to second guess this exercise of the trial court's discretion. *See id.* at 452.[7]

Accordingly, the trial court did not abuse its discretion in overruling Defendant's objection and permitting the projection of the enlargements of the eleven pictures before the jury. Point III is denied.

### 3) *Decision*

The judgment of the trial court is affirmed.

BATES, P.J./C.J., and GARRISON, J., concur.

---

7. We note that Defendant's objection at trial was to the projected enlargements of all eleven photographs, whereas on appeal he specifically claims error as to only seven of them. During trial, Defendant objected that the eleven enlarged photographs as a group were more prejudicial than probative because of the manner in which they were projected. He did not articulate to the trial court any specific prejudice elicited by any particular individual photograph. Objections to evidence must be specific so that the trial court is fully informed of the reasons of the objection, and can thereby make a reasoned and informed ruling. *State v. Hoy,* 219 S.W.3d 796, 2007 WL 1160269, *11 (Mo.App. S.D.). "Any grounds that are not raised in the objection are considered waived, and a party is prevented from raising such grounds for the first time on appeal." *Id.* "Changing the grounds for the objection or broadening the grounds is also prohibited." *Id.* Defendant did not articulate to the trial court the specific prejudice elicited by any one photograph; consequently, we cannot review his claims as to specific photographs on appeal. Defendant has not articulated any specific prejudice as to individual photographs on appeal either. The only basis for Defendant's objection at trial was that the manner in which all eleven photographs were enlarged made them more prejudicial than probative, so we approach and dispose of Defendant's third point on that basis. *State v. Love,* 546 S.W.2d 441, 451 (Mo.App.1976).